CARGILL, INCORPORATED, a Delaware corporation, and Cargill Investor Services, Inc., a Delaware corporation, Plaintiffs/Counterclaim Defendants,

v.

JWH SPECIAL CIRCUMSTANCE LLC, a Delaware limited liability company, Defendant/Counterclaim Plaintiff.

Civ. A. No. 3234–VCP.

Court of Chancery of Delaware.

Submitted: June 20, 2008.
Decided: Nov. 7, 2008.

Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire, James S. Green, Jr., Esquire, Landis Rath & Cobb, LLP, Wil-

mington, DE; Jerome A. Miranowski, Esquire, Michael M. Krauss, Esquire, Faegre & Benson, LLP, Minneapolis, MN, for Plaintiffs/Counterclaim Defendants Cargill, Incorporated and Cargill Investor Services, Inc.

Todd C. Schiltz, Esquire, Wolf Block, LLP, Wilmington, DE; William Z. Pentelovitch, Esquire, Wayne S. Moskowitz, Esquire, Julian C. Zebot, Esquire, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for Defendant/Counterclaim Plaintiff JWH Special Circumstance LLC.

## OPINION

PARSONS, Vice Chancellor.

This is an action by a representative of a Delaware statutory trust, which suffered significant losses as a result of a transfer of certain of its assets to the Refco Group shortly before Refco's collapse in late 2005, against the parent and grandparent entities of the trust's managing owner. The trust's representative claims the managing owner violated its fiduciary duties to the trust, and that the managing owner's parent and grandparent are liable, directly or indirectly, for exercising control over or aiding and abetting the managing owner's actions to serve their own self-interest. The parent and grandparent filed the complaint in this action seeking a declaratory judgment of no liability. The trust counterclaimed. The parent and grandparent have moved to dismiss the counterclaim and for judgment on the pleadings in their favor. For the reasons stated in this opinion, I deny those motions in all respects.

## I. BACKGROUND

### A. Facts[1]

#### 1. The parties

Counterclaim Plaintiff, JWH Special Circumstance LLC ("JWH"), is a Delaware limited liability company. Its only member is the JWH Global Trust (the "Trust"), a Delaware statutory trust. The Trust is a publicly registered commodities pool that trades futures and forward contracts[2] on currencies, interest rates, energy and agricultural products, metals and stock indices, spot and forward contracts on currencies and precious metals, and exchanges for physicals.[3] During the relevant time period, the Trust had over 13,500 investors ("Unitholders").[4] The Trust formed JWH to pursue, sell, or settle claims on the Trust's behalf.

There are two Counterclaim Defendants in this action. The first, Cargill, Inc. ("Cargill"), is one of the nation's largest privately held corporations.[5] Cargill produces and sells food, agricultural, and risk

1. Based on the pleadings, many facts are undisputed. No citations to the record are provided for those facts.

2. "Forwards" are contracts to buy or sell a specified commodity at a specified price at a certain date in the future. William J. Carney, *Corporate Finance* 538–39 (2005). The difference between forwards and futures is that a forward is traded over-the-counter whereas a future is exchange-traded and involves the use of a clearinghouse. *Id.*

3. An "exchange for physicals" is a transaction whereby "the buyer of a cash commodity transfers to the seller a corresponding amount of long futures contracts, or receives from the seller a corresponding amount of short futures, at a price difference mutually agreed upon." http://www.cftc.gov/education center/glossary/glossary_e.html. Thus, an exchange for physicals is a type of transaction that buyers and sellers of a cash commodity can use to complete a cash transaction in the underlying commodity and also to offset opposing futures hedges at the same time.

4. Defendant JWH Special Circumstance LLC's Amended Counterclaims, Answer to Plaintiffs' Verified Complaint for Declaratory Judgment, and Affirmative Defenses ("Counterclaim" or "CC") ¶ 1.

5. CC ¶ 12.

management products and services. The second Counterclaim Defendant, Cargill Investor Services, Inc. ("CIS," and together with Cargill, the "Cargill Plaintiffs"), is a wholly owned subsidiary of Cargill that is or was in the financial services business. CIS offered futures, options, securities, and foreign exchange services.[6] Cargill was the grandparent and CIS the parent of CIS Investments, Inc. ("CISI" or "Managing Owner"), which acted as the managing owner of the Trust.[7]

## 2. The creation and organization of the Trust

The Trust was organized on November 12, 1996 as a statutory trust, under the Delaware Statutory Trust Act (the "Act").[8] The Declaration and Agreement of Trust (the "Trust Agreement") is the Trust's governing instrument.[9] Although CISI signed the Trust Agreement, neither Cargill nor CIS is a party to it.

Section 4 of the Trust Agreement states the "objective of the Trust is appreciation of its assets through speculative trading." That section also states the "business and purpose" of the Trust is "to trade, buy, sell, or otherwise acquire, hold, or dispose" of a variety of securities, options, and futures and forward contracts, as well as arbitrage and cash trading of those instruments.

The Wilmington Trust Company served as the trustee,[10] but the Trust Agreement generally delegated the duty and authority of the Trustee to manage the business and affairs of the Trust to the Managing Owner.[11] From November 12, 1996 until at least August 31, 2005, CISI served as the Trust's Managing Owner.[12] Throughout this period, CISI was a direct and wholly owned subsidiary of CIS and an indirect subsidiary of Cargill. CISI's one and only office is in CIS's office suite in Chicago, Illinois.[13]

In addition to being CISI's parent, CIS also served as the Trust's futures and forwards broker. Another of Cargill's wholly owned subsidiaries, CIS Financial Services, Inc. ("CISFS"),[14] served as the Trust's foreign currency and precious metals broker. CISFS was a direct or indirect subsidiary of Cargill. Also, according to the August 2005 Prospectus, John W.

6. CC ¶ 13.

7. CC ¶ 15. Although much of this case centers on the actions of CISI in its role as the Managing Owner, CISI is not a party to this action.

8. 12 Del. C. §§ 3801–3826. From its enactment in 1988 until its amendment in 2002, the Act was called the "Business Trust Act," and what are now called "statutory trusts" were known as "business trusts." *See* 12 Del. C. § 3801(g); *see generally* 3 Edward P. Welch, Andrew J. Turezyn, and Robert S. Saunders, *Folk on the General Corporation Law* § 12–3801 (Supp. 2008). For convenience, I refer to the Trust as a statutory trust throughout.

9. The Trust Agreement is attached to the Complaint as Exhibit A.

10. CC ¶ 27.

11. Trust Agreement § 2(b).

12. Compl. ¶ 11; CC ¶ 15. There is a dispute, described *infra* Part II.B, about whether CISI continued to exist as the same entity after control of CISI was sold.

13. CC ¶ 17.

14. The pleadings do not make clear whether CISFS is a direct or indirect subsidiary of Cargill or whether that makes a difference. The Trust's Prospectus, dated August 1, 2005 ("August 2005 Prospectus"), states that CIS Holdings is the parent of CISFS and a subsidiary of Cargill, which suggests CISFS is an indirect subsidiary of Cargill. August 2005 Prospectus at 10. The August 2005 Prospectus is attached to the Cargill Plaintiffs' opening brief in support of their motion to dismiss as Exhibit A.

Henry & Company, Inc. served as the Trust's trading advisor ("Trading Advis- or"). A simplified diagram of the Trust's organization looks like this:

The August 2005 Prospectus informed Unitholders that the "Trust's assets are generally deposited with CIS and CISFS."[15] The Prospectus explains:

> 100% of all subscription proceeds are invested directly into the Trust. . . .

> The Trust uses subscription proceeds to margin its speculative futures trading, as well as to pay trading losses and expenses. At the same time that the Trust's assets are being used as margin, they are also available for active or passive cash management.[16]

The Prospectus also informed Unitholders that Trust deposits were held "in cash, Treasury bills or other short term money market instruments" with CIS and CISFS.[17] As reflected in that Prospectus, the Trust's Foreign Exchange Account Agreement with CISFS ("Forex Agreement") provided that CISFS would pay the Trust a risk-free rate of return, calculated based on U.S. Government Securities, for the Trust's cash on deposit at CISFS.[18] The August 2005 Prospectus also disclosed that the Trust's primary credit risk was its counterparty risk with CISFS, i.e., its exposure to the nonperformance of CISFS.[19] CISFS minimized this risk by entering into forward contracts only with well-capitalized institutions and then entering into back-to-back contracts with the Trust.[20]

### 3. CISI's interlocking officers and directors

CISI has no employees other than those also employed at either Cargill or CIS.[21] None of the officers and directors of CISI

---

**15.** Aug. 2005 Prospectus at 64.

**16.** *Id.* at 16.

**17.** CC ¶ 50.

**18.** *Id.* Although this is how the Counterclaim characterizes the interest rate on the Trust's deposits, the Prospectus indicates that the interest might be calculated differently based on whether the deposits are denominated in dollars, held in foreign currency, or held as margin on markets not currently traded by the Trading Advisor. *See* Aug. 2005 Prospectus at 64. The pleadings do not disclose exactly how the Trust's assets and deposits were handled by CIS or CISFS, but I note the August 2005 Prospectus indicates the Trust's assets on deposit were supposed to be used as "margin to secure the Trust's obligations under the open positions which it holds in the markets or as a reserve to support further trading in the event of market losses." *Id.* The August 2005 Prospectus suggests that risk-free return for the Unitholders on funds on deposit with CIS and CISFS was only a portion of the potential return sought by the Trust. As the "business and purpose" of the Trust suggests, a major portion stemmed from the Trust's investments in futures and so on. *See* Trust Agreement § 4; *see also* Aug. 2005 Prospectus at 3–4 ("To date, the performance of the Trust has been volatile. . . . The Trust could incur large losses over short periods.").

**19.** CC ¶ 51.

**20.** *Id.*

**21.** CC ¶ 18. The following table lists each of the officers, directors, and employees of CISI and their positions with CISI, CIS, and Cargill, per the Counterclaim:

| Name | CISI Position | CIS Position | Cargill Position |
| --- | --- | --- | --- |
| James A. Davison | CEO, Director | Worldwide Business Unit Leader | |
| Shaun D. O'Brien | Executive Vice-President, CFO, Director | Vice–President | |
| Leslie S. Allen | Executive Vice-President | "responsible for execution of [CIS's] strategy and the global leadership of its Securities Financing Group" | |
| Barbara Pfendler | Vice-President, Director | Vice-President | |
| Patrice H. Halbach | Vice-President | | Vice-President-Tax |

received their cash compensation or health and retirement benefits directly from CISI, but rather received those forms of compensation from Cargill or CIS.[22] Also, the CISI officers and directors were supervised by and received performance reviews from CIS or Cargill.[23]

### 4. The Refco Agreement

On or about June 21, 2005, Cargill entered into a purchase and sale agreement pursuant to which Cargill would sell parts of its financial services business to Refco Group Ltd., LLC, a wholly owned subsidiary of Refco, Inc. (collectively, "Refco"), in exchange for over $4 billion in payments and assumed liabilities (the "Refco Transaction").[24] As part of that transaction, Cargill agreed to sell to Refco, among other things, the assets of CIS, which included control of CISI.[25]

Section 5(a)(3) of the Trust Agreement provides for the dissolution of the Trust upon an event that:

[C]auses [CISI] to cease to be managing owner of the Trust unless within 90 days after such event all Unitholders agree in writing to continue the business of the Trust and to the appointment, effective as of the date of such event, of one or more managing owners of the Trust[26]

. . . .

In this case, Unitholder consent for the change in control of the Managing Owner was neither sought nor obtained. JWH alleges that, by structuring the portion of the Refco Transaction concerning CISI as a stock sale, Cargill "circumvented" the Unitholder consent provision.[27] Refco agreed to purchase all issued and outstanding shares of CISI from CIS. In the Refco Agreement, Cargill undertook to "cause each officer and member of the Board of Directors" of CISI "to tender his resignation from such position" at closing.[28] After the closing, CISI's name was changed to Refco Commodity Management, Inc. ("RCMI").

| | | | |
|---|---|---|---|
| C. Robert Paul | Vice President-Law, Chief Legal Officer | "employed at [CIS]" | "directly reported to Cargill's legal department" |
| Annette A. Cazenave | Vice President | "held positions [at CIS]" | |
| Steven S. Andrews | Head of North American Compliance, Futures, and Foreign Exchange | "employed by [CIS]" | |
| Todd Urbon | Vice-President and Treasurer | "employee of [CIS]" | |
| Penelope J. Beckhardt | Secretary | "employed by [CIS]" | |
| Anne R. Carlson, James Clemens, Lynn M. Dasso, Lillian Lundeen, and Jeanne Y. Smith | Assistant Secretaries | "employee[s] of Cargill or [CIS]" | "employee[s] of Cargill or [CIS]" |

22. CC ¶¶ 19–21.

23. CC ¶ 22.

24. CC ¶ 55. A copy of the Refco Agreement is attached to the Complaint as Exhibit B.

25. CC ¶ 55.

26. CC ¶ 32. Section 16 of the Trust Agreement similarly states that the Trust "shall be dissolved upon the ... withdrawal ... of [CISI], or any other event that causes [CISI] to cease to be the managing owner of the Trust, unless the Trust is continued pursuant to the terms of Section 5(a)(3)."

27. CC ¶ 8.

As a result of the Refco Transaction, the Trust's futures accounts were transferred from CIS to Refco, LLC. Also, the Trust's foreign currency accounts were transferred from CISFS to Refco Capital Markets ("RCM"), a Bermuda entity. To facilitate the foreign exchange account transfer, Cargill agreed that it would cause CISFS to assign the Forex Agreement to Refco.[29] There is no dispute that the operative agreements contemplate that the Trust had to consent to such an assignment of the Forex Agreement and that the Managing Owner gave that consent. In the Refco Agreement, Cargill and CIS undertook to cause CISFS to use "all reasonable best efforts to obtain all consents, approvals, certificates and documents required" to effectuate that assignment.[30] The Refco Agreement further provided that if necessary consents were not obtained, Cargill would "cooperate" with Refco "in any commercially reasonable arrangement requested by [Refco] to provide [Refco] the benefits" of the Trust's Forex Agreement with CISFS.[31]

In mid-June 2005, James Davison, CEO of CISI and Worldwide Business Unit Leader of CIS, summoned a number of CIS employees, including some who were CISI employees, to London.[32] According to JWH's Counterclaim, Davison informed these employees that CIS and CISI were being sold to Refco, and instructed them to "do everything necessary to facilitate and expedite the closing of the transaction with Refco."[33] JWH further alleges some CIS employees, including some who were directors and officers of CISI, reacted to the news of the sale to Refco with incredulity and apprehension because of Refco's poor reputation in the industry.[34]

The Counterclaim alleges that Refco did have a checkered past.[35] In 1994, the Commodities Futures Trading Commission had fined Refco $1.2 million for secretly switching funds from customer accounts to cover a Refco's subsidiary's debts. In 1996, Refco was fined close to a million dollars for failing to segregate accounts, and had been cited on at least three previous occasions for similar violations. In 1999, Refco was fined $7 million for violations in order-taking and recordkeeping. In February 2005, Refco's own auditors had found "significant deficiencies in [Refco's] internal controls over financial reporting," and these deficiencies were noted in a Refco prospectus filed with the SEC in July 2005.

On June 22, 2005, the Trust filed a Form 8–K with the United States Securities and Exchange Commission announcing that Refco had agreed to acquire the global brokerage operations of CIS. A July 2005 monthly report advised Unitholders that, "[a]fter the [Refco] acquisition closes, Refco will become the owner of [CISI] and Refco's subsidiary, Refco, LLC, will become futures broker of the Fund."[36] The Unitholders were not informed that the Forex Agreement would be assigned or that Trust assets held by CISFS would be turned over to an allegedly unregulated Bermuda affiliate of Refco.[37]

28. CC ¶ 71.

29. CC ¶ 76.

30. CC ¶ 77; *see* Refco Agreement § 7.4(a).

31. CC ¶ 78.

32. CC ¶ 57.

33. CC ¶ 58–59.

34. CC ¶ 60.

35. CC ¶¶ 64–67.

36. CC ¶ 62.

37. *Id.*

### 5. The transfer of the Forex Agreement to RCM and subsequent losses to the Trust

Before the closing, CISI consented to both the futures and foreign exchange account transfers. On August 5, 2005, attorneys for Mayer, Brown, Rowe & Maw, LLP ("Mayer Brown"), a law firm who represented CISI and the Trust, transmitted to CISI Vice President Annette Cazenave two letters on CISFS stationary requesting the Trust to consent to the assignment to RCM of the Forex Agreement and the cash bullion account agreement the Trust had with CISFS. One or more Mayer Brown attorneys told Cazenave that another Mayer Brown attorney, Joseph Collins (who represented Refco and later was indicted in connection with that representation), had instructed that these steps be taken and that she should sign the documents on behalf of CISI.[38] Cazenave was never told to obtain independent legal advice on behalf of the Trust or CISI, or to conduct an independent analysis of whether the consent to transfer of the Forex Agreement was in the best interest of the Trust.[39] Cazenave complied with the request and consented to the transfers on the Managing Owner's and Trust's behalf.

On October 10, 2005, Refco publicly announced the existence of a fraudulent $430 million receivable on its books. RCM, the Trust's new foreign exchange broker, allegedly had a history of misappropriating customer assets to finance Refco's overall business operations and acquisitions, and continued that practice after it acquired the Forex Agreement of CISFS and took custody of the Trust's deposits.[40] News of the Refco fraud caused a run on funds held by RCM, and discovery of its misappropriation of customer assets. Although RCM should have had over $3.7 billion in client-account assets, in reality it had only $1.9 billion.[41] On October 12, RCMI (the Trust's new managing owner) requested a transfer of Trust assets from RCM, but the request was denied.

On October 17, 2005, Refco, Inc., RCM, and certain other Refco affiliates filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York. A liquidation followed, but the Trust recovered only $20,870,466 of the total $56,544,205 the Trust had in its account at RCM.[42]

On October 12, 2006, R.J. O'Brien & Associates ("RJO") acquired RCMI's interest as the managing owner of the Trust. On October 16, 2006, RCMI filed a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code. On or about December 1, 2006, the Trust created JWH for the sole purpose of pursuing, selling, or settling claims on the Trust's behalf. In August 2007, JWH provided the Cargill Plaintiffs with a draft complaint JWH intended to file against them in Minnesota. Before JWH filed its complaint, however, the Cargill Plaintiffs commenced this action in Delaware.

### B. Procedural History

On September 17, 2007, the Cargill Plaintiffs filed a Verified Complaint for Declaratory Judgment ("Complaint") in this Court. The Complaint sought: (i) a declaration that the Cargill Plaintiffs do not owe, and never owed, any fiduciary obligation to the Trust; (ii) a declaration

---

**38.** CC ¶ 81.

**39.** CC ¶¶ 83, 87.

**40.** CC ¶ 91–92.

**41.** CC ¶ 100.

**42.** CC ¶ 102.

the Cargill Plaintiffs never breached any fiduciary obligation to the Trust or its Unitholders; and (iii) an award of costs and expenses incurred by the Cargill Plaintiffs in connection with this action.

On November 16, 2007, JWH answered and counterclaimed. On January 10, 2008, JWH filed amended counterclaims (the "Counterclaim"), along with an answer and affirmative defenses to the Complaint. The Counterclaim consists of six separate counts. Counts One and Two accuse Cargill and CIS, respectively, of breaching fiduciary duties they owed to the Trust; Counts Three and Four claim Cargill and CIS aided and abetted breaches of fiduciary duty committed by CISI, as the Managing Owner; and Counts Five and Six assert claims against each of the Cargill Plaintiffs for negligence.

On January 29, 2008, the Cargill Plaintiffs moved for a judgment on the pleadings and to dismiss JWH's Counterclaim. The parties briefed and argued that motion, and this is the Court's opinion regarding it.[43]

### C. Parties Contentions

JWH claims that, in addition to CISI, Cargill and CIS also owed fiduciary duties to the Trust under the Trust Agreement and general principles derived from the law of trusts. JWH claims that the Cargill Plaintiffs owed fiduciary duties directly to the Trust and breached those duties. JWH bases these direct claims, in part, on its allegation that the Cargill Plaintiffs exercised "dominion and control" over CISI.[44] According to JWH, the Cargill Plaintiffs exercised control over the Managing Owner by virtue of their ownership interest in CISI and interlocking manage-ment. JWH claims that the Cargill Plaintiffs violated their fiduciary duties by "circumventing" the Trust Agreement when they sold control of the Managing Owner, CISI, to Refco without obtaining the Unitholders' consent. Before selling control of the Managing Owner to Refco, the Cargill Plaintiffs also allegedly used their control over CISI to cause it to consent to the transfer of Trust assets to a Refco affiliate as part of the Refco Transaction to promote their own interests and without regard for the interests of the Trust. According to JWH, Cargill and CIS "directed and caused" CISI to consent to transferring the Trust's cash and other investment assets from the relative safety of the Trust's account at CISFS to the "fraudulent and insolvent Refco Bermuda entity that almost immediately misappropriated them."[45]

By consenting to the transfer of the Forex Agreement, JWH claims, CISI violated its fiduciary duties. JWH also claims CISI consented to the transfer of that agreement without acting with the care, loyalty, and good faith required by the Trust Agreement and the law of trusts. Because Cargill and CIS exercised dominion and control over CISI in connection with the Refco Transaction, says JWH, they, too, owed similar fiduciary duties to the Trust, and breached those duties.

Alternatively, JWH accuses the Cargill Plaintiffs of aiding and abetting CISI's breaches of fiduciary duties. In that regard, JWH argues that even if the Cargill Plaintiffs did not themselves have fiduciary duties of care, candor, loyalty, good faith, and safekeeping the Trust assets, they

---

43. As to citations in this opinion to the parties' submissions regarding the motion *sub judice*, "POB" refers to the Cargill Plaintiffs' opening brief, "DAB" refers to JWH's answering brief, "PRB" stands for the Cargill

Plaintiffs' reply brief, and "Tr." signifies the transcript of the oral argument.

44. CC ¶ 45.

45. CC ¶ 6.

knew CISI had such duties and knowingly participated in CISI's breach of its duties.

JWH also asserts general negligence claims against the Cargill Plaintiffs. According to JWH, Cargill and CIS are liable on this general negligence theory for selling control of the Trust and its assets to Refco when they were on at least inquiry notice that Refco would loot the Trust.

The Cargill Plaintiffs deny any liability for the Trust's losses. Although they acknowledge the Managing Owner owed fiduciary duties to the Trust, the Cargill Plaintiffs deny either Cargill or CIS owed any duties to the Trust. Furthermore, even if they did have a fiduciary duty to the Trust, the Cargill Plaintiffs contend JWH has not alleged facts sufficient to support an inference that Cargill or CIS breached any such duty. Likewise, the Cargill Plaintiffs deny that JWH has stated a claim against them for aiding and abetting CISI's alleged breach of fiduciary duties, because the allegations in the pleadings do not support an inference that CISI breached its duties or that the Cargill Plaintiffs knew of or participated in such a breach.

The Cargill Plaintiffs have made a two-part motion. First, they seek dismissal of JWH's Counterclaim under Court of Chancery Rule 12(b)(6). Second, the Cargill Plaintiffs seek a judgment on the pleadings pursuant to Rule 12(c). The motion relates to all six counts of the Counterclaim. Thus, it pertains to the claims against the Cargill Plaintiffs for (1) a direct breach of fiduciary duty, (2) an indi-

rect breach of fiduciary duty through their affiliate CISI, and (3) negligence.

## II. ANALYSIS

### A. Standard of Review

■■■ A court should not grant a motion to dismiss pursuant to Rule 12(b)(6) "unless it can be determined with reasonable certainty that the [nonmoving party] could not prevail on any set of facts reasonably inferable" from the pleadings.[46] The court must assume the truthfulness of the well-pleaded allegations and must afford the nonmoving party "the benefit of all reasonable inferences."[47] Mere conclusory allegations, however, will not be accepted as true without specific supporting allegations of fact.[48]

■■■ A Rule 12(c) motion is similar but not identical. Rule 12(c) provides: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." A party is entitled to judgment on the pleadings when, accepting as true and drawing all reasonable inferences from the nonmoving party's well-pleaded facts, "there is no material fact in dispute and the moving party is entitled to judgment under the law."[49]

### B. Has JWH Adequately Pleaded a Direct or Indirect Breach of Fiduciary Duty by Cargill or CIS Based on Their Sale of Control of CISI to Refco?

Counts One through Four of the Counterclaim include claims that the Cargill

---

**46.** *In re Primedia, Inc. Deriv. Litig.*, 910 A.2d 248, 256 (Del.Ch.2006) (quoting *Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 908 (Del.Ch.2002)).

**47.** *Id.*

**48.** *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del.1996).

**49.** *In re Seneca Invs. LLC*, 2008 WL 4329230, at *2 (Del.Ch. Sept.23, 2008) (quoting *Warner Commc'ns Inc. v. Chris–Craft Indus. Inc.*, 583 A.2d 962, 965 (Del.Ch.1989), *aff'd*, 567 A.2d 419 (Del.1989)).

Plaintiffs breached their own fiduciary duties and aided and abetted CISI's breach by "improperly circumventing the protections in the Trust Agreement that require Unitholder approval for a change in Managing Owner or a change to the structure of the Trust or its investment policies."[50] The predicate for this aspect of JWH's Counterclaim is that certain changes which occurred pursuant to the Refco Transaction were such that the Managing Owner would have been required under the Trust Agreement or some other equitable rubric to obtain approval of those changes by the Unitholders.[51]

 As to this aspect of its Counterclaim, JWH has not asserted a cognizable claim. First, the Cargill Plaintiffs were not parties to the Trust Agreement, and JWH has not alleged that either of them directly breached that Agreement. Second, for the aiding and abetting claim, JWH would have to explain how CISI, which was a party to the Trust Agreement, could have breached the Trust Agreement by allowing itself to be sold or for failing to cause its own dissolution at a time when *it was still* the Managing Owner. Moreover, even if JWH addressed these surface problems, which it does not, it has not stated a coherent reason to disregard a fundamental tenet of corporate law: a corporation has a continuity of existence regardless of its component members.[52] Even though every stockholder of a corporation may change, the corporation maintains its own identity in perpetuity,[53] because it is a separate and distinct legal entity from its shareholders.[54]

**50.** CC ¶¶ 111(j), 116(j), 122(j), 128(j).

**51.** *See* Trust Agreement §§ 5(a)(3), 16. Section 5(a)(3) provides in pertinent part:

> The term of the Trust ... shall end upon the first to occur of the following: ... (3) the bankruptcy, retirement, resignation, expulsion, withdrawal, insolvency or dissolution of the Managing Owner, or any other event that causes the Managing Owner to cease to be managing owner of the Trust unless within 90 days after such event all Unitholders agree in writing to continue the business of the Trust....

The relevant portion of Section 16 of the Trust Agreement states:

> The Trust shall be dissolved upon the death, insanity, bankruptcy, retirement, resignation, expulsion, withdrawal, insolvency or dissolution of the Managing Owner or any other event that causes the Managing Owner to cease to be the managing owner of the Trust, unless the Trust is continued pursuant to the terms of Section 5(a)(3). In addition, the Managing Owner may withdraw from the Trust, without any breach of this Declaration and Agreement of Trust, at any time upon 120 days' written notice by first class mail, postage prepaid, to the Trustee, each Unitholder and each assignee of whom the Managing Owner has notice....

> The Managing Owner may not assign its general liability interest or its obligation to manage the Trust without the consent of each Unitholder; provided, however, that the consent of Unitholders is not required if the Managing Owner assigns its general liability interest and its obligation to manage the Trust to an entity controlling, controlled by or under common control with the Managing Owner, provided that such entity (i) expressly assumes all obligations of the Managing Owner under this Declaration and Agreement of Trust and (ii) is entitled to act in the capacity of managing owner for the benefit of the Trust. The Managing Owner shall notify all Unitholders of such assignment. The Managing Owner will notify all Unitholders of any change in the principals of the Managing Owner.

**52.** *See* William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 6 (2006).

**53.** Perpetual existence depends on whether or not the certificate of incorporation contains a § 102(b)(5) provision. *See* 8 Del. C. § 102(b)(5).

**54.** *See Orzeck v. Englehart,* 195 A.2d 375, 377 (Del.1963).

Here, CIS controlled CISI through stock ownership before the Refco Transaction. By purchasing the stock of CISI from CIS, Refco controlled CISI when the Refco Transaction closed. Thus, CISI continued to exist after the closing, even though control of it at both the management and shareholder levels shifted from CIS to Refco. Sometime later, Refco changed the name of CISI to RCMI.

▇ As to whether anyone can be liable, not for breaching the Trust Agreement, but simply for an inequitable "circumvention" of it, I note that the drafters of the Trust Agreement easily could have included a "change of control" provision in it, but did not. "[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it."[55] The allegations of the Counterclaim do not support an inference that the parties intended such a provision here. Accordingly, I conclude that the alleged direct and indirect breach of fiduciary duty claims based on "circumvention" of the Trust Agreement through selling control of CISI fail to state a claim.

## C. The Claims Against the Cargill Plaintiffs for Direct Breaches of Fiduciary Duties (Counts One and Two)

▇ JWH advances a theory of direct fiduciary liability for the Cargill Plaintiffs based on a line of partnership cases beginning with *In re USACafes, L.P. Litigation.*[56] These cases deal with the fiduciary duties owed by those that control a fiduciary of an underlying entity. In particular, if a corporate parent of the fiduciary

exercises dominion and control over the fiduciary in connection with a transaction that benefits the corporate parent at the expense of the underlying entity, the corporate parent may owe fiduciary duties directly to the underlying entity in connection with that transaction. JWH urges this Court to apply the same principle in the context of a statutory trust, such as the Trust at issue here, because this line of cases explicitly relies upon theories derived from trust law. JWH contends that under these cases the Cargill Plaintiffs would at least owe duties of loyalty to the Trust, because the Cargill Plaintiffs caused CISI to consent to the transfer of the Forex Agreement to Refco, and they did so for their own benefit at the expense of the Trust.

The Cargill Plaintiffs counter that the *USACafes* line of cases and the underlying trust law principles on which they are based cannot be applied to statutory trusts, essentially because the Delaware Statutory Trust Act preempts the field.[57] At the height of their argument, the Cargill Plaintiffs suggest that the Act creates a kind of *sui generis* entity for which virtually no default duties are implied by the Act or the common law. Therefore, the Cargill Plaintiffs maintain that, in the absence of any positive statement in the Trust Agreement explicitly attributing fiduciary duties to a corporate parent of a fiduciary, such a corporate parent would not owe any duty to the statutory trust whatsoever.

▇ This aspect of the Cargill Plaintiffs' argument lacks merit. The Act does not completely preempt either the field of

**55.** *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1035 (Del.Ch.2006).

**56.** 600 A.2d 43 (Del.Ch.1991). The cases that follow include: *James River–Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554 (Del. Ch. Mar.6, 1995); *Wallace v. Wood,* 752 A.2d

1175 (Del.Ch.1999); *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners,* 2001 WL 1641239 (Del.Ch. Dec.4, 2001); and *In re Primedia Inc. Deriv. Litig.,* 910 A.2d 248 (Del.Ch.2006).

**57.** PRB at 5–8.

trust law or the application of traditional default fiduciary duties. With two major carve-outs, the Act explicitly subjects Delaware statutory trusts to existing trust law concepts. Section 3809 of the Act states: "Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts...."[58] Thus, unless the Trust Agreement or the Act "otherwise provides," existing trust law applies, including default fiduciary duties provided by statute or common law.

In the *USACafes* case, relied upon by JWH, the court held that the defendant directors of a corporate general partner who thereby dominated and controlled the underlying partnership could be liable for breach of fiduciary duty to the limited partners. In that case, Chancellor Allen relied almost entirely upon fiduciary duties derived from the traditional defaults of trust law, relating to the fiduciary duties owed to trust beneficiaries by corporate parents of trustees.[59] As discussed in Part II.D.1 *infra*, a similar result could obtain here. First, however, I must address the threshold question presented in § 3809— *i.e.*, whether the Trust Agreement or the Act overrides the usual applicability of the laws of this State pertaining to trusts.

### 1. Does the Trust Agreement preempt default duties owed directly by the Cargill Plaintiffs to the Trust?

Delaware statutory trusts were designed with flexibility in mind. Section 3825(b) states: "It is the policy of this subchapter to give maximum effect to the principle of freedom of contract and to the enforceability of governing instruments."[60] Consis-

---

**58.** 12 Del. C. § 3809. The Cargill Plaintiffs also rely heavily on a law review article for the proposition that the statutory trust "effectively represents the minimum required by law in creating a strong entity ... and leaves the rest to be determined by contract." PRB at 8, *quoting* Henry Hansmann et al., *Law and the Rise of the Firm*, 119 Harv. L. Rev 1333, 1397 (2006); *see also* PRB at 3. The Hansmann article states, for example, "the Delaware business trust statute does not even offer default terms for most of [the] basic structural elements" of a statutory trust. Hansmann, *supra*, at 1397. Although the Act may provide minimal *mandatory* defaults that the parties may not contract out of, it also provides a general default provision. *See* 12 Del. C. § 3809. Because the article does not address the impact of § 3809 on their analysis, it provides little guidance on the issue presented here.

**59.** *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del.Ch.1991). There, the court stated: "The law of trusts represents the earliest and fullest expression of [fiduciary duties] in our law, but courts of equity have extended it appropriately to achieve substantial justice in a wide array of situations." *Id.* (citations omitted). In addition, after noting the absence of any case directly on point, the court

noted that, "the question has arisen whether directors of a corporate trustee may personally owe duties of loyalty to *cestui que trusts* of the corporation." *Id.*

**60.** *See also Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 782 (Del.Ch.1998) (noting the Act "reveals a clear intent on the part of the General Assembly to grant business trusts broad freedom in establishing internal governance mechanisms"). In this sense, the policy regarding statutory trusts is consistent with that for other alternative business entities. This can be seen in the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). *See* 6 Del. C. § 17–1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."). Similarly, the Delaware Limited Liability Company Act explicitly embodies a policy of giving "the maximum effect ... to the enforceability of limited liability company agreements." 6 Del. C. § 18–1101(b). Delaware courts have long recognized that the "basic approach" to the LLC "is to provide broad discretion in drafting" the agreement, as well as encouraging private ordering and customization. *Elf Atochem N.A., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del.1999).

tent with this emphasis on freedom of contract, the Act enables the parties to bargain for modifications to the traditional default duties and standards of liability applicable to fiduciaries.

■■■ Section 3806(c) of the Delaware Statutory Trust Act expressly authorizes modification or even elimination of certain common law duties:

> To the extent that, at law or in equity, a trustee or beneficial owner or other person has duties (including fiduciary duties) to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument, the trustee's or beneficial owner's or other person's duties may be expanded or restricted or eliminated by provisions in the governing instrument; provided, that the governing instrument may not eliminate the implied contractual covenant of good faith and fair dealing.[61]

Notably, this section does not state that for there to be any duties, the governing instrument must so provide. Rather, § 3806(c) recognizes that "in law or equity, a trustee or beneficial owner or other person [might have] duties (including fiduciary duties)." The parties are, however, free in the governing instrument to "expand," "restrict," or "eliminate" whatever preexisting duties there might be, except for the implied covenant of good faith and fair dealing.[62]

Similarly, as to standards of liability,[63] § 3806(e) of the Act states:

> A governing instrument may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a trustee, beneficial owner or other person to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument; provided, that a governing instrument may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.[64]

As with § 3806(c), § 3806(e) does not state that for there to be any liability, the Trust Agreement must so provide. Indeed, both provisions contemplate the preexistence of fiduciary duties and potential liabilities for breaching those duties that may be modified by the governing instrument.

■■■ At this point, it is important to consider what duties and standards of liability the Delaware statutes and common

---

**61.** 12 Del. C. § 3806(c). Again, DRULPA contains almost identical language, regarding limited partnerships. *See* 6 Del. C. § 17–1101(d).

**62.** *Cf.* 12 Del. C. § 3806(d) (providing that good faith reliance on the provisions of a trust agreement precludes liability, *unless* the trust agreement provides otherwise) (emphasis added).

**63.** The parties have tended to conflate Sections 3806(c) and (e), but they are different. To one not well-versed in Delaware fiduciary duty law, it might appear incongruous that a fiduciary, for instance, might have a duty to act non-negligently but only be liable for gross negligence. For an incisive discussion of this topic in the corporate context, see William T. Allen, Jack B. Jacobs, and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 26 Del. J. Corp. L. 859, 871–74 (2001) (describing the dislocation as an intentional and well-crafted divergence between the standard of review or liability and the standard of conduct the Delaware courts apply to the duty of care). *See also* 8 Del. C. § 102(b)(7) (allowing exculpation for monetary liability for corporate fiduciaries in situations amounting to a breach of the duty of care).

**64.** 12 Del. C. § 3806(e). Once again, DRULPA contains almost identical language. *See* 6 Del. C. § 17–1101(f).

law impose on trust fiduciaries and their affiliates to see how the parties to the Trust Agreement might have modified them. Like a corporate fiduciary, the fiduciary of a trust has a duty of care.[65] There is a difference, however, between standards of liability for breaches of the duty of care for trusts and corporations. As Chancellor Allen explained:

> The role of the trustee is prudently to manage assets placed in trust, within the parameters set down in the trust instrument. The classic trusteeship is not essentially a risk taking enterprise, but a caretaking one. Hence, while trustees may be surcharged for negligence, a corporate director is only considered to have breached his duty of care in instances of gross negligence.[66]

Similarly, Delaware courts have found the fiduciary duty of loyalty to be stricter in trust law than corporate law.[67] This duty of loyalty also differs from that owed to a corporation in that a "trustee's failure to adhere to the requirements set down in the trust instrument is itself a breach of loyalty."[68] Nevertheless, the Statutory Trust Act does not mandate negligence as

the standard of liability for breaching the duty of care. Nor does the Act state that failing to adhere to the trust agreement must in all cases result in a breach of the duty of loyalty.

That the Legislature intended to permit the parties to negotiate for a standard of liability higher or lower than that applied to a traditional trustee is not surprising, given the variation in the uses of statutory trusts beyond the more traditional uses of personal trusts, such as facilitating gratuitous wealth transfers, discussed in *Technicolor*. The legislative synopsis of the original Delaware Business Trust Act states:

> This bill statutorily recognized common law trusts created for business purposes as the State of Massachusetts did many years ago. A business trust is the favored form of entity for money market mutual funds, and for real estate investment trusts, and other investment entities involved in the securitization of debt.[69]

Likewise, the current Act enables the parties to a statutory trust to vary the applicable duties owed by fiduciaries to best suit particular kinds of business ventures.[70]

---

**65.** *See* 12 Del. C. § 3302(a) (articulating the prudent person rule for trustees). The prudent person standard is "analogous to the duty of care in the corporate context." 3 Edward P. Welch, Andrew J. Turezyn, and Robert S. Saunders, *Folk on the General Corporation Law* § 12–3806.2.1 (Supp. 2007).

**66.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1148 (1994).

**67.** *See Stegemeier v. Magness,* 728 A.2d 557, 562 n. 22 (Del.1999) ("The premise that the fiduciary duty of loyalty is more relaxed in corporate law [than trust law] was recognized in Delaware as early as 1911.") (citing *Eberhardt v. Christiana Window Glass Co.,* 81 A. 774, 778 (Del.Ch.1911)).

**68.** *Technicolor,* 663 A.2d at 1148. In addition to the duties of care and loyalty, a trustee has other duties, including: (i) to keep and render accounts, (ii) to furnish information, (iii) to take and keep property, (iv) to preserve trust

property, (v) to enforce claims, (vi) to defend actions, (vii) to keep trust property separate, (viii) to manage deposit accounts, (ix) to make the trust property productive, (x) to distribute or apply income and principal in accordance with the terms of the trust, and (xi) to remain impartial. *See* 3 Austin Wakeman Scott et al., *Scott and Ascher on Trusts* §§ 17.1–17.16 (5th ed. 2007).

**69.** Substitute No. 1 for S. 355, 134th Gen. Assembly 7, 66 Del. Laws c. 279, § 1 (1988).

**70.** For commentary on why some consider the trust form particularly suitable to certain types of business ventures rather than others, see Steven L. Schwarcz, *Commercial Trusts as Business Organizations: Unraveling the Mystery,* 58 Bus. Law. 559 (2003); John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce,* 107 Yale L.J. 165 (1997).

Because of the parties' flexibility to "restrict" or "eliminate" both duties and standards of liability for breaches of those duties, I begin my analysis of JWH's Counterclaim by examining the Trust Agreement to determine if and how the Trust Agreement manifests an intent of the parties to modify the default duties imposed by the law of trusts on fiduciaries and their corporate parents. In that connection, I also address whether the Trust Agreement modifies the scope of liability for a managing owner's "affiliates," as that term is defined in the Trust Agreement or other relevant documents, in a way that would influence the liability questions before me.

According to the Cargill Plaintiffs, the "Trust Agreement provides that Cargill and CIS may be held liable to the Trust only for conduct taken while acting or performing services on the Trust's behalf."[71] Cargill and CIS base that contention on § 18(a) of the Trust Agreement, entitled "Standard of Liability for the Managing Owner," which reads:

> The Managing Owner and its Affiliates, as defined below, shall have no liability to the Trust or to any Unitholder for any loss suffered by the Trust which arises out of any action or inaction of the Managing Owner or its Affiliates, if the Managing Owner, in good faith, determined that such course of conduct was in the best interests of the Trust, and such course of conduct did not constitute negligence or misconduct of the Managing Owner or its Affiliates.

Section 18(b), entitled "Indemnification of the Managing Owner by the Trust," defines "Affiliate" for purposes of § 18 more narrowly than another section of the Trust Agreement.[72] Section § 18(b) reads:

> For the purposes of this Section 18, the term "Affiliates" shall mean *any person acting on behalf of or performing services on behalf of the Trust* who: (1) directly or indirectly controls, is controlled by, or is under common control with the Managing Owner; or (2) owns or controls 10% or more of the outstanding voting securities of the Managing Owner; or (3) is an officer or director of the Managing Owner; or (4) if the Managing Owner is an officer, director, partner or trustee, is any entity for which

---

71. PRB at 2.

72. For clarity, I refer to an Affiliate as defined in § 18(b), as a "§ 18 Affiliate." Section 22 of the Trust Agreement, entitled "Certain Definitions," provides the following broader definition of "affiliate" taken from the North American Securities Administrators Association Guidelines for Registration of Commodities Pool Operators ("NASAA Guidelines"), which does not require that the putative affiliate has acted for or performed services on behalf of the trust:

> An Affiliate of a Person [in this case the Managing Owner] means: (a) any Person directly or indirectly owning, controlling or holding with power to vote 10% or more of the outstanding voting securities of such Person; (b) any Person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such Person;

(c) any Person, directly or indirectly, controlling, controlled by, or under common control of such Person; (d) any officer, director or partner of such Person; or (e) if such Person is an officer, director or partner, any Person for which such Person acts in any such capacity.

In turn, "Person" is defined in § 22 as any "natural Person, partnership, corporation, association or other legal entity."

As the preamble to Section 22, quoted below, makes clear, however, these and other definitions in § 22 have limited application in the Trust Agreement. Specifically, the preamble states: "This Declaration and Agreement of Trust contains certain provisions required by the NASAA Guidelines. The terms used in such provisions are defined as follows (the following definitions are included *verbatim* from such Guidelines and, accordingly, may not in all cases be relevant to the Declaration and Agreement of Trust). . . ."

the managing owner acts in any such capacity.[73]

■ Cargill and CIS essentially contend that, for purposes of this case, they do not qualify as Section 18(a) Affiliates because in taking the challenged actions they were not "acting on behalf of or performing services on behalf of the Trust." In the case of Cargill, there is no allegation that Cargill ever fit that description. CIS, on the other hand, admittedly acted on behalf of the Trust as its futures broker. The Cargill Plaintiffs posit, however, that CIS can only be liable for acts it took in that capacity. Specifically, they argue that to the extent JWH seeks to impose liability on CIS for its participation in the transfer of the Forex Agreement, CIS was not acting as the futures broker in that context, and, therefore, was not an Affiliate of CISI.[74] Then, according to the Cargill Plaintiffs, the Court should conclude that they both fall outside the scope of § 18(a), and the Trust Agreement thereby eliminates any fiduciary duties Cargill and CIS otherwise might have had to the Trust under the laws of Delaware pertaining to trusts. I find this argument unpersuasive.

Section 18 is an exculpatory provision. It states that a § 18 Affiliate will not be deemed liable for its actions taken on behalf of the Trust, if two conditions are met: (1) the Managing Owner in good faith believed that the course of conduct taken by the § 18 Affiliate was in the best interest of the Trust, and (2) that course of conduct did not constitute negligence or misconduct by the Managing Owner or § 18 Affiliate. Neither Section 18(a) nor Section 18(b) mentions potential liability for actions not performed on behalf of the Trust. Thus, if the Cargill Plaintiffs did not take the challenged actions on behalf of the Trust, Section 18 arguably would not apply to those actions. I do not infer from that, however, that the Cargill Plaintiffs owed no duties to the Trust.

Section 18 does not purport to delineate those who may owe duties to the Trust or be liable for breach of those duties. Instead, it exculpates the Managing Owner and those Affiliates that acted on behalf of or for the Trust from liability in certain specified circumstances. Because it is an exculpatory provision, § 18(a) simply does not address whether Cargill or CIS owed any fiduciary duty to the Trust. The failure to exculpate an entity for breach of a duty does not necessarily mean that entity had no duties in the first place.[75] Thus, I conclude that nothing in the Trust Agreement eliminates all fiduciary duties the

73. Trust Agreement § 18(b) (emphasis added).

74. PRB at 3–4. Whether CIS would be excluded from the scope of Section 18(a) on that basis, or would still be a § 18 Affiliate because it had the status of having performed services for the Trust, albeit in an unrelated capacity, is debatable. Although CIS plausibly argues that it would be considered a § 18 Affiliate, and therefore potentially entitled to exculpation, only for actions it took as a futures broker for the Trust, that is not the only reasonable construction of Section 18. Nothing in Section 18(a) or (b) expressly limits the effects of those sections to instances where the putative affiliate acted or performed services on behalf of the Trust and those actions formed the basis for the claims against the affiliate. Conceivably, for example, an entity that acted on behalf of the Trust at some point would then have the status of a § 18 Affiliate for all purposes, even as to claims unrelated to the acts or services they performed. For purposes of the pending motions, however, I need not resolve that issue. Rather, I assume *arguendo* that Cargill and CIS are both outside the scope of Section 18 and conclude for the reasons discussed below that they still may have duties to the Trust.

75. For example, in the corporate context, both officers and directors of a corporation owe fiduciary duties to the company and its shareholders. Under 8 Del. C. § 102(b)(7), however, a corporation may include in its charter a provision exculpating directors from personal liability for monetary damages for breach of a fiduciary duty, subject to certain limitations. The fact that § 102(b)(7) relates only to directors, and not officers, does not

Cargill Plaintiffs might have owed to the Trust under the law of trusts.

## 2. Does the Act itself preempt duties the Cargill Plaintiffs otherwise would have had under the law of trusts?

■ As described in the preceding sections, the Act generally does not create duties or specify mandatory standards of review or liability, but rather references certain default principles, such as: "Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts...."[76] Thus, in the absence of language in the governing instrument or the Act itself to the contrary, this Court must apply the statutory and common law relating to trusts. Having previously concluded that the Trust Agreement does not preclude liability for either CIS or Cargill, I next examine whether the Act modifies any of the principles that would apply under the law of trusts.

■ The Cargill Plaintiffs argue that Section 3806(a) of the Act precludes liability for Cargill or CIS.[77] They base their argument on the following statutory language:

Except to the extent otherwise provided in the governing instrument of a statuto-

ry trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to be a trustee.

The Cargill Plaintiffs contend this language means that "an entity's exercise of power over the trust's manager does not create a fiduciary relationship with the trust, unless the governing agreement provides otherwise."[78] The Act does indicate that an entity's exercise of power over a trust's managing owner, in and of itself, does not subject that entity to the fiduciary duties of a trustee. Hence, a claim against a managing owner's parent based solely on the fact that the managing owner effectively acted as the parent's agent would appear to be precluded in the circumstances of this case. Yet, whether § 3806 also would preclude a claim against a parent entity under the *USACafes* line of cases, relied upon by JWH, for causing the fiduciary of the Trust to engage in a transaction that benefits the parent, such as Cargill or CIS, at the expense of the Trust requires further analysis.

Section 3806(a) consists of four sentences, the third of which is quoted above. Because a couple of the other sentences are relevant to this inquiry, § 3806(a) is set forth in full in the margin with the sentences numbered.[79] The first sentence represents an analog to § 141(a) of the

---

negate the existence of fiduciary duties on the part of the officers.

**76.** 12 *Del. C.* § 3809.

**77.** PRB at 7.

**78.** *Id.*

**79.** Section 3806(a) of the Act provides:

[1] Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees. [2] To the extent

provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust. [3] Except to the extent otherwise provided in the governing instrument of a statutory trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such a person to be a trustee. [4] To the extent provided in the governing instrument of a statutory trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any

Delaware General Corporation Law: "Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees."[80] Consistent with the second sentence of § 3806(a), the Trust Agreement provides that, with certain limited exceptions, "the duty and authority of the Trustee to manage the business and affairs of the Trust are hereby delegated to the Managing Owner [CISI]."[81]

The Cargill Plaintiffs base their argument that they owed no duty to the Trust on the next sentence of Section 3806(a). Nevertheless, a close reading of § 3806(a), and particularly the third and fourth sentences of that section, reveals a serious flaw in the Cargill Plaintiffs' argument.

The fourth and last sentence in § 3806, which the Cargill Plaintiffs do not address, reads:

> To the extent provided in the governing instrument of a statutory trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial person (including a beneficial owner) shall cause such person to have duties (including fiduciary duties) or liabilities relating thereto to the statutory trust or to a beneficial owner thereof.

owner) shall cause such person to have duties (including fiduciary duties) or liabilities relating thereto to the statutory trust or to a beneficial owner thereof.

Unlike the third sentence, which the Cargill Plaintiffs rely upon and which begins with "[e]xcept to the extent otherwise provided," the *fourth* sentence of § 3806(a) starts, "[t]o the extent provided." Thus, the default under the third sentence where the trust agreement does not otherwise provide is that those who have control over the trustee or other persons will not be deemed trustees. Because the Trust Agreement does not provide that CIS or Cargill will be deemed trustees, they cannot be deemed "trustees." The fourth sentence differs materially, however, because it requires a provision *in the trust agreement* to override any fiduciary duties those who have control over the managing owner might otherwise have under the law of trusts. The parties have not pointed to any provision in the Trust Agreement here that persuades me that those who control the Managing Owner, CISI, will have no fiduciary duties whatsoever.[82] Therefore, the Cargill Plaintiffs' reliance on § 3806 is misplaced.[83]

---

**80.** 12 *Del. C.* § 3806(a).

**81.** Trust Agreement § 2(b).

**82.** The legislative synopsis of the 1998 amendment to § 3806(a) of the Statutory Trust Act, which added the fourth sentence, notes that the subsection "confirms that the governing instrument of a business trust may provide that a person does not have duties or liabilities to a business trust or to a beneficial owner thereof as a result of having the power to direct the trustees or other persons in the management of the business trust." S. 308 as amended by S. Amendment 1, 139th Gen. Assembly 16, 71 Del. Laws, c. 335 § 5 (1998).

**83.** The Cargill Plaintiffs also cite the Virginia Business Trust Act for support. PRB at 7. This argument is not only unpersuasive, but also shows the Delaware Act could have been drafted as the Cargill Plaintiffs contend, but was not. Essentially, the cited provision of the Virginia statute says what the Cargill Plaintiffs mistakenly read the Delaware Act as saying:

> Except to the extent provided in the governing instrument of a business trust, neither the power to give direction to a trustee or other persons, nor the exercise of any person of a direction, including a beneficial owner, shall cause that person to have duties, including fiduciary duties, or liabilities relating to the business trust or to a beneficial owner, or cause any such person to be a trustee.

Va.Code Ann. § 13.1–1228(B). The difference is that the relevant sentence of the Delaware Act begins with "To the extent that,"

The Cargill Plaintiffs also rely upon a federal decision from the Southern District of New York applying the Delaware Act.[84] That decision, however, does not offer much, if any, support for the Cargill Plaintiffs' argument. There, the plaintiffs argued that the last sentence of § 3806(a) demonstrated that those who control the trustee were subject to default fiduciary duties. The court characterized this as a "logical reading," but noted that "it assumes the point in controversy, *i.e.,* the existence of a default rule that imposes fiduciary duties [on those that] exercise some authority."[85] The plaintiff in that case failed to cite sufficient Delaware law to convince the court that any default fiduciary duties existed. On that basis alone, this case is distinguishable.

Similarly, the Cargill Plaintiffs reliance on a leading treatise on Delaware law of business organizations is equally unavailing.[86] Section 19.3 of the treatise upon which the Cargill Plaintiffs rely addresses how § 3806(a) of the Act rejects the "control test," a test used to make beneficial owners of business trusts "personally subject to liabilities to third persons ... [depending] on the extent of the beneficial owners' control over the conduct and the affairs of the business trust."[87] As the treatise explains, the effect of the third sentence of § 3806(a), discussed *supra,* is as follows: "Thus, the right of beneficial owners, or any class or group of beneficial owners, to participate in the management of the statutory trust will not deem the beneficial owners exercising such manage-

rial discretion to be fiduciaries with respect to the other beneficial owners of the trust."[88]

The conduct of the Cargill Plaintiffs challenged in this action, however, involves more than "participating in the management of the statutory trust" or "exercising such managerial discretion." According to JWH, Cargill and CIS caused the Managing Owner to take actions to effectuate a transaction for the benefit of Cargill or CIS without regard to the interest of the Trust. To the extent the Cargill Plaintiffs would owe duties to the Trust in those circumstances, the last sentence of § 3806(a) indicates that those duties would continue to exist, absent a provision in the Trust Agreement to the contrary. The cited treatise does not contradict that conclusion.[89]

For these reasons, I conclude that nothing in the Statutory Trust Act preempts an application of default fiduciary duties drawn from the Delaware law of trusts to Cargill or CIS for the actions they are accused of taking in relation to the Refco Transaction.

**D. Did JWH Adequately Plead Facts Leading to a Reasonable Inference that the Cargill Plaintiffs Had and Breached a Fiduciary Duty to the Trust?**

**1. Did the Cargill Plaintiffs owe a duty to the Trust?**

JWH's primary argument rests upon a theory drawn from the common law deal-

---

whereas the Virginia Business Trust Act begins with "Except to the extent that," just like the third sentence of § 3806(a) relied upon by the Cargill Plaintiffs.

**84.** PRB at 6–7, citing *Calvin Klein Trademark Trust v. Wachner,* 123 F.Supp.2d 731, 735 (S.D.N.Y.2000).

**85.** *Calvin Klein,* 123 F.Supp.2d at 735.

**86.** PRB at 7, citing R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 19.3 (Supp. 2005).

**87.** Balotti, *supra* note 86, at § 19.3.

**88.** *Id., quoted in* PRB at 7.

**89.** *See id.* at § 19.7 (Supp. 2004).

ing with the fiduciary duties owed by the corporate parents of fiduciaries. As mentioned in Part II.C *supra*, JWH relies on a line of cases that discusses the fiduciary duties owed to an underlying entity by those who control the managers of that entity.[90] I first address whether these cases and the principles they enunciate apply to statutory trusts in general, and the Trust in issue, in particular. I then address whether JWH adequately pleaded facts, which, if true, would support a reasonable inference that CIS or Cargill is liable under the *USACafes* line of cases.

In *USACafes*, Chancellor Allen extended fiduciary concepts derived from trust law to limited partnerships, holding that the "theory underlying fiduciary duties is consistent with recognition that a director of a corporate general partner bears such a duty towards the limited partnership."[91] The court denied a motion to dismiss, finding the complaint alleged "facts which if true establish that the director defendants have breached fiduciary obligations imposed upon them as directors of a Delaware corporation or have participated in a breach of such duties by the General Partner."[92]

In *James River–Pennington*, then Vice Chancellor, now Chief Justice Steele followed the reasoning of *USACafes* and held that a corporation owed a duty of loyalty to a partnership, because the corporation controlled the general partner.[93] Former

Vice Chancellor Steele reaffirmed in *Wallace* the same general principle observing that the "addition of the Parents' and Affiliates' [of the general partner] as defendants may, arguably, be a minor distinction," but that the plaintiffs had detailed sufficiently "the Parents and Affiliates control of the affairs of the Partnership" to make those distinctions irrelevant.[94]

In *Bigelow*, Vice Chancellor Noble, following the rationale in *Wallace*, held that various "upstream" entities controlling general partners could owe fiduciary duties to either the partnership or the limited partners.[95] The court clarified the type of circumstances that might give rise to fiduciary duties: "While mere ownership—either direct or indirect—of the general partner does not result in the establishment of a fiduciary relationship, those affiliates of a general partner who exercise control over the partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners."[96] Finally, in *Primedia*, Vice Chancellor Lamb described how a private equity group, even if it were not a controlling shareholder of a corporation, might owe fiduciary duties to the corporation's stockholders, because it controlled the corporation through a complex structure of intermediate entities.[97] There, to prove the private equity group had fiduciary obligations to the corporation, the plaintiffs

---

90. *See* discussion *supra* notes 56–59 and accompanying text; DAB at 22–30.

91. *In re USACafes, L.P. Litig.*, 600 A.2d 43, 49 (Del.Ch.1991).

92. *Id.* at 50.

93. *James River–Pennington, Inc. v. CRSS Capital, Inc.*, 1995 WL 106554, at *11 (Del.Ch. Mar. 6, 1995) (recognizing also that the fiduciary duties might be modified by the partnership agreement).

94. *Wallace v. Wood*, 752 A.2d 1175, 1182 (Del.Ch.1999).

95. *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners*, 2001 WL 1641239, at **1–2, 8–9 (Del.Ch. Dec. 4, 2001).

96. *Bigelow*, 2001 WL 1641239, at *8.

97. *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 258 n. 26 (Del.Ch.2006) (citing *Wallace*, 752 A.2d at 1175).

had to show that the group "effected actual control over the corporate actions challenged in the complaint."[98]

Turning to the specific context of the Cargill Plaintiffs' motion to dismiss, I hold that the fiduciary duties recognized in the *USACafes* line of cases arise from the law of trusts and, thus, are potentially applicable to this case, because neither the Trust Agreement nor the Statutory Trust Act precludes that possibility. The Cargill Plaintiffs have not articulated any persuasive basis for drawing a material distinction between the corporate parent of a trustee and the corporate parent of a general partner or a director of a general partner or any of the other scenarios addressed in the *USACafes* case and its progeny.[99]

■■■ The Trust Agreement delegates the function of the Trustee to the Managing Owner, CISI, and thereby subjects it to fiduciary duties.[100] The Trust Agreement further provides: "Except as otherwise provided herein or disclosed in the prospectus, the Unitholders will under no circumstances be deemed to have contracted away the fiduciary obligations owed them by the Managing Owner under the common law."[101] Based on the extension of fiduciary duties to those who control fiduciaries in the *USACafes* line of cases, Cargill and CIS *may* owe fiduciary duties in the same way as the upstream entities in those cases, depending on the nature of the Refco Transaction and the kind of control and the degree of participation the Cargill Plaintiffs had in CISI's decision to consent to the transfer of the foreign exchange agreement to a Refco affiliate.[102]

**98.** *Id.* at 257.

**99.** I also reject the Cargill Plaintiffs' contention that the "price of the Units reflected" the "limits on Cargill and CIS's potential liability." PRB at 5. Based on the complexity of factual and legal issues presented here and in the absence of any financial analysis or discovery to support this argument, it seems at least equally likely the opposite is true.

**100.** For a discussion of the fiduciary duties owed by the Managing Owner, see *infra* Part II.E.1.

**101.** Trust Agreement § 9(b).

**102.** JWH also contends that the Cargill Plaintiffs owed the Trust a fiduciary duty of loyalty under the NASAA Guidelines in that they are "Sponsors" of the Trust under those Guidelines. DAB at 30–31. The NASAA Guidelines provide that Sponsors owe an unwaivable "fiduciary responsibility for the safekeeping . . . of all funds and assets of the [Trust]," and "shall not employ, or permit another to employ such funds or assets in any manner except for the exclusive benefit of the" Trust. *Id.*, quoting NASAA Guidelines § VII(A). The Guidelines define "Sponsor" to include entities that were "directly or indirectly instrumental in organizing the" Trust and who meet the definition of an "affiliate" of the

Managing Owner. *Id.* at 30. Cargill and CIS arguably meet those requirements.

Even assuming the Cargill Plaintiffs would be Sponsors within the meaning of the NASAA Guidelines, however, I do not agree that would give rise to any duty on their part to the Trust. There is no allegation that Delaware has adopted the NASAA Guidelines; in fact, the Cargill Plaintiffs note that Delaware is not listed among the twenty states that have adopted the Guidelines or the thirteen other states that informally follow them. *See* POB at 14. More importantly, although the Counterclaim quotes the provision of the Guidelines that imposes certain responsibilities on the "Sponsor" (CC ¶ 40), nothing in the Trust Agreement indicates that the parties intended to incorporate that provision into the Agreement. Instead, the Trust Agreement adopts and incorporates only a few select provisions of the NASAA Guidelines, and then includes in Section 22 the NASAA Guidelines definitions that might be pertinent to those provisions. The term "Sponsor" appears in Section 22, but apparently nowhere else in the Trust Agreement. Further, the preamble to Section 22 expressly cautions that the NASAA definitions it includes "may not in all cases be relevant to this [Trust Agreement]." Therefore, I do not find any basis in the NASAA Guidelines for imputing a fiduciary duty to the Cargill Plaintiffs in this case.

Although *USACafes* did not delineate the full scope of a corporate parent's duties, Chancellor Allen did state that "it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."[103] Applying the same principles, I hold that the Cargill Plaintiffs could be shown on the facts alleged to have had a duty not to use their control over the Trust or its property to advantage Cargill or CIS at the expense of the Trust. Thus, to defeat the pending motions to dismiss and for judgment of the pleadings, JWH would have to allege specific facts that lead to a reasonable inference that (1) CIS or Cargill exercised control over the Trust or its assets in connection with the Refco Transaction, and (2) exercised that control to benefit themselves at the expense of the Trust.

### 2. Did Cargill or CIS Exercise Control over CISI or the Trust Assets in Connection with the Refco Transaction?

■ The Counterclaim stems from an agreement entered into with Refco on or about June 21, 2005, as part of Cargill's decision to exit the financial services business. Under the Refco Agreement, Cargill agreed to sell various assets to Refco for over $4 billion in payments and assumed liabilities.[104] Among the assets Cargill sold were CIS's brokerage operations, including its ownership of CISI. In addition, Cargill promised to cause two of its subsidiaries to assign the Trust's futures agreement (with CIS) and Forex Agreement (with CISFS) to Refco subsidiaries. JWH essentially claims CISI presented a potential roadblock to the complete transfer of the Forex operations. First, CISI had the power to cancel the Trust's Forex Agreement with CISFS. Second, to effect the complete transfer of the Forex Agreement, including the Trust's account, the Trust had to consent. To overcome these roadblocks, JWH alleges that Cargill did two things.

First, Cargill agreed that it would prevent CISI from terminating the Trust's Forex Agreement with CISFS without Refco's prior written consent. Cargill, therefore, effectively tied the hands of CISI in terms of one of the ways in which it could have responded to the impending Refco Transaction to further the interests of the Trust. When I asked counsel for the Cargill Plaintiffs about this at argument, he responded that the perceived "hand-tying ... [was] over a very limited period of time," evidently referring to the period between the signing of the Refco Agreement in June 2005 and its closing in August 2005.[105] Yet, this timeframe was crucial to the Trust in terms of its ability to take effective action to insulate itself from any unacceptable risks that might be associated with the Refco Transaction. Thus, contrary to the argument of the

---

103. *In re USACafes, L.P. Litig.*, 600 A.2d 43, 49 (Del.Ch.1991). JWH alleges that the Cargill Plaintiffs "owed fiduciary duties of loyalty, care, candor, disclosure, to safekeep Trust assets, and not to cause CIS Investments to violate its fiduciary duties to the Trust." CC ¶ 46. At this preliminary stage, the parties have not provided sufficiently thorough arguments as to the exact scope of the applicable duties owed by the Cargill Plaintiffs to permit me to delineate those duties conclusively beyond the duty of loyalty. Consequently, for purposes of the pending motions, I rely solely on the duty of loyalty without prejudice to the possibility of additional duties, as well.

104. Cargill's sale of CISI to Refco closed on or about August 31, 2005. In the Refco Transaction, Cargill received $208 million and was relieved of approximately $4 billion in obligations that Refco assumed. In addition, the Refco Agreement provided for Refco to make an additional post-closing payment to Cargill of between $67 million and $192 million. CC ¶ 95.

105. Tr. at 72.

Cargill Plaintiffs, I believe this aspect of the Refco Transaction supports a reasonable inference that. they did exercise control over CISI and the Trust.

Second, JWH alleges a series of events that, when taken together with the restriction on CISI's ability to terminate the Forex Agreement, lead to a reasonable inference that Cargill and CIS controlled CISI's decision to consent to the transfer of the Forex Agreement. CISI's employees overlap significantly with CIS and to a lesser degree with Cargill. CIS, however, is allegedly controlled by Cargill, as reflected in Cargill's "causing" CIS to assign the futures agreement. Additionally, CISI employees receive their compensation from CIS or Cargill—not CISI. Cargill also agreed in the Refco Agreement to "use all reasonable best efforts to obtain all consents." [106]

Furthermore, JWH alleges that after Cargill agreed to sell the assets of CIS, Davison, the CEO of CISI and Worldwide Business Unit Leader of CIS, summoned a number of CIS employees, including some who were also CISI employees, to London. Davison informed these employees that CIS and CISI were being sold to Refco, and instructed them to "do everything necessary to facilitate and expedite the closing of the transaction with Refco." On August 5, 2005, attorneys for Mayer Brown, the law firm who represented Refco, transmitted to CISI Vice President Cazenave two letters on CISFS stationary requesting the Trust to consent to the assignment of the Forex Agreement with CISFS to Refco.

JWH avers one or more Mayer Brown attorneys told Cazenave that another Mayer Brown attorney, Joseph Collins (who also represented Refco and therefore may have had an ethical conflict), had instructed that she should sign the documents on behalf of CISI.

JWH alleges that when Cazenave signed the consent on behalf of the Trust she had not been told to obtain any independent legal advice on behalf of the Trust (or even CISI). CISI also was never told to conduct an independent analysis of whether the consent to transfer of the Forex Agreement with CISFS was in the best interest of the Trust.

These and other similar allegations in the Counterclaim are sufficient to support a reasonable inference that the Cargill Plaintiffs exercised control over the Trust and its assets to facilitate the consummation of the Refco Transaction. Thus, for pleading purposes, JWH has met the first requirement for demonstrating the existence of a fiduciary duty under the *USACafes* line of cases.[107]

### 3. Did Cargill or CIS Control CISI in a way that Benefited Cargill and CIS at the Expense of the Trust?

JWH has alleged facts that, if true, support a reasonable inference that Cargill or CIS benefited from the control over CISI at the Trust's expense in connection with the Refco Transaction. Assuming JWH's allegations are true, the circumstances surrounding CISI's consent to the assignment

**106.** The Cargill Plaintiffs point to this language as evidencing their lack of control over CISI. When the factual record is developed further, this argument may have some traction. At the pleading stage, however, Cargill's undertaking to use "reasonable best efforts" supports an inference it was motivated to cause CISI to approve the transfer. That inference together with other facts alleged in the Counterclaim convince me that JWH may

be able to show Cargill and CIS exercised control over the Trust and its assets regarding the Refco Transaction.

**107.** For the same reasons, I find that a genuine issue of material fact exists as to a key premise of the Cargill Plaintiffs' motion for judgment on the pleadings—*i.e.*, that CIS and CISI were separately managed. *See* Compl. ¶ 11; CC ¶ 152.

of the Forex Agreement are suspect. The potentially conflicted role of the CISI Vice President Cazenave, as well as the Mayer Brown attorneys, the restriction on CISI's ability to terminate the Forex Agreement, and the absence of any indication in the record in terms of SEC filings or the like to counter the implication of JWH's allegations that CISI made no independent assessment of the risks and benefits of its consent from the point of view of the Trust, lead to an inference that CISI's consent was motivated by a desire to close on the Refco Agreement at the behest of the Cargill Plaintiffs for their benefit. This may not be the only possible inference from the facts alleged, but it is one reasonable inference.

JWH has alleged that Cargill received a benefit from selling the Forex Agreement. In the Refco Transaction, Cargill received over $4 billion in payments and assumed liabilities from the sale of assets and undertook, among other things, to sell the Forex Agreement to Refco. One reasonably can infer, therefore, that Cargill received a benefit from the sale of the Forex Agreement. Likewise, it is reasonable to infer that the value of CISI to Refco depended in part on the transfer of the Trust's assets on deposit with CISFS to RCM. CIS presumably also received a benefit from the sale to Refco of its controlling interest in CISI and the related transfer of the Forex Agreement.

The Cargill Plaintiffs deny that they exercised control over the Trust or its assets for their own benefit at the expense of the Trust. In response to JWH's claims that "Refco paid Cargill for the transfer of the Forex Agreement and possession of the Trust's cash at a low interest rate to RCM,"[108] the Cargill Plaintiffs counter that Cargill only sold *"CISFS's* stake in the

Forex Agreement—an asset that did not belong to the Trust."[109] Moreover, the Cargill Plaintiffs continue, the Trust's Forex accounts were "transferred to RCM only after Refco replaced Cargill as the Managing Owner's ultimate parent."[110] These arguments strike me as hypertechnical. Based on the facts alleged, it is reasonable to infer that by transferring the Forex Agreement the Cargill Plaintiffs contemplated and intended that the Trust's assets on deposit, and the benefit of holding those assets, would also be transferred. Moreover, Cargill and CIS allegedly facilitated that transfer by causing CISI to consent to the transfer of the Forex Agreement.

CISFS acted as the counterparty for the Trust's foreign exchange trades. To take a simplified example of how this might work, say the Trust wanted to bet on currency A strengthening against currency B. CISFS would stand on the opposite side of the trade, taking the opposite position—currency B would strengthen against currency A. CISFS would then enter into back-to-back mirror image trades with third-parties to hedge its own risk. Using the same example, CISFS would go long currency A against currency B with a well-capitalized third-party. CISFS would thereby be both long and short currency A at the same time; the Trust would be long currency A; and the third-party would be short currency A. Because CISFS entered into the back-to-back trade with a well-capitalized institution, it would have reduced the risk that CISFS would not be able to pay the Trust, if currency A strengthened, because the third-party would have to pay CISFS the same amount CISFS owed the Trust.

---

**108.** PRB at 12, citing DAB at 25.

**109.** PRB at 12.

**110.** *Id.* at 12–13.

The Trust would have assets on deposit with CISFS to pay fees, to cover margin, or to put up collateral for the trades. According to JWH, CISFS would pay the Trust interest on those deposits. CISFS, however, would keep as revenues any amount over and above the principal amount and what it paid in interest to the Trust. Thus, I consider the Cargill Plaintiffs' contention that the sale of the Forex Agreement only transferred CISFS's interest in the Forex Agreement to be oversimplified. It is reasonable to infer the Trust's Forex account and the deposits in that account would follow the Trust's Forex Agreement to Refco, especially in light of CISI's transfer on behalf of the Trust.

At one point, the Cargill Plaintiffs assert that the "Trust's power under the Forex Agreement was the only Trust asset Cargill 'used' to enrich itself at the Trust's expense."[111] But they argue that Cargill did not actually benefit from the consent, because under § 7.4(b) of the Refco Agreement, Cargill agreed to provide Refco with the benefits of the Forex Agreement if the Managing Owner did not consent to the transfer. According to the Cargill Plaintiffs, they would have received the same consideration upon the closing whether or not the Managing Owner consented to the transfer of the Forex Agreement. Cargill's position seems to be that if CISI had not consented, Cargill simply would have forwarded whatever profit CISFS made from the agreement to Refco. Therefore, according to the Cargill Plaintiffs, whether CISI consented or not was zero sum for Cargill.

Having considered the Cargill Plaintiffs' arguments, I still find that JWH's allegations raise sufficient questions about whether Cargill benefited from the transfer of the Forex Agreement at the expense of the Trust to withstand the pending motions. JWH alleges the transfer of the

Forex Agreement benefited Refco in terms of both brokerage fees for and the ability to hold the Trust's assets on deposit. If CISI did not consent, Cargill might have been able simply to pass through these benefits to Refco. Under the Refco Agreement, however, if CISI did not consent, Refco—not Cargill or CIS—had the option of choosing a commercially reasonable arrangement to provide Refco the benefits under the Forex Agreement. There is no telling what Refco would have requested, and that uncertainty reasonably can be considered a cost for Cargill. Thus, I find JWH conceivably could show that the Cargill Plaintiffs stood to benefit from causing CISI to consent to the transfer.

As for the detriment to the Trust, the public filings of the Trust state that one of the most important risks to its Unitholders was the possibility that its counterparty CISFS might not perform under the Forex Agreement. CISFS took various measures, including entering into contracts with well-capitalized institutions, to minimize the counterparty risk. As a result, JWH avers, the Trust received only a risk-free rate of return on funds it maintained on deposit with CISFS. Refco allegedly did business in a much riskier way than CISFS. Yet, the Trust was not compensated for that risk, and received a return on its deposits that merely reflected CISFS's low counterparty risk. That is, by obtaining the Trust account, Refco received the benefit of relatively cheap money. Refco may have paid Cargill for that benefit, but it did not pay the Trust. I need not address that issue, however, because Cargill benefited from the sale of the Forex Agreement in more obvious ways, and the Trust ultimately lost over $30 million that it arguably would not have lost had the Forex Agreement not been trans-

111. PRB at 13.

ferred to Refco. Thus, the facts alleged in the Counterclaim support a reasonable inference that Cargill and CIS controlled CISI, and caused CISI to consent to the assignment of the Forex Agreement for their own self-interest and for reasons that had no perceptible benefit to the Trust. Accordingly, the motions to dismiss Counts One and Two of the Counterclaim and for judgment on the pleadings on those counts will be denied.

### E. Does the Counterclaim State a Claim for Aiding and Abetting the Managing Owner's Breach of Fiduciary Duty (Counts Three and Four)?

JWH also asserts that Cargill and CIS aided and abetted a breach of fiduciary duty by the Managing Owner, CISI. Under Delaware law, a successful claim for aiding and abetting a breach of fiduciary duty requires proof of four elements: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[112]

#### 1. The fiduciary duties of the Managing Owner

For the first element, the Managing Owner has duties that are described in the Trust Agreement. The Agreement provides:

> The Managing Owner shall be under a fiduciary duty to conduct the affairs of the Trust in the best interests of the Trust, provided that the Managing Owner shall not be obligated to engage in any conduct on behalf of the Trust to the detriment of any other commodity pool to which the Managing Owner owes similar fiduciary duties.... The Managing Owner's fiduciary duty includes, among other things, the safekeeping of all funds and assets of the Trust and the use thereof for the benefit of the Trust. The funds of the Trust will not be commingled with the funds of any other person or entity (deposit of funds with a commodity or securities broker, clearinghouse or forward dealer shall not be deemed to constitute "commingling" for these purposes). The Managing Owner will take no actions with respect to the property of the Trust which do not benefit the Trust. The Managing Owner shall at all times act with integrity and good faith and exercise due diligence in all activities relating to the conduct of the business of the Trust and in resolving all conflicts of interest.[113]

As to CISI, the Trust Agreement describes several fiduciary duties the Managing Owner owes to the Trust, including to: (i) conduct the affairs in the best interest of the Trust; (ii) keep safe all funds and assets of the Trust and see they are used for the benefit of the Trust; (iii) not commingle Trust funds; (iv) abstain from actions which do not benefit the Trust; (v) act with integrity and good faith; and (vi) exercise due diligence.

JWH argues that these enumerated duties do no supplant the Managing Owner's common law fiduciary duties.[114]

---

112. *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *15 (Del.Ch. Nov. 30, 2007).

113. Trust Agreement § 9(b).

114. DAB at 4. In support of this contention, JWH cites § 9(b) of the Trust Agreement, which states: "Except as otherwise provided herein or disclosed in the Prospectus, the Unitholders will under no circumstances be deemed to have contracted away the fiduciary obligations owed them by the Managing Owner under the common law."

No party has identified any difference that would be material to the pending motions between the duties of the Managing Owner, CISI, under the common law and those specified in the Trust Agreement.[115] Thus, for purposes of this opinion, I assume congruence between CISI's contractual and common law fiduciary duties.

The Trust Agreement's descriptions of the Managing Owner's fiduciary duties use terms that embody traditional fiduciary concepts. I interpret the duty of acting with "due diligence" to impose a traditional "duty of care" on the Managing Owner.[116] The Trust Agreement's requirement that CISI conduct the affairs of the Trust in the best interest of the Trust and abstain from actions which do not benefit the Trust calls to mind the duty of loyalty. In general, therefore, I consider it appropriate to look for guidance in interpreting such terms in the context of this dispute from analogous sources outside of the four corners the Trust Agreement.[117]

### 2. Does the counterclaim adequately allege a breach of the Managing Owner's fiduciary duties?

JWH has pleaded a set of facts that, if true, leads to a reasonable inference that the Managing Owner breached its fiduciary duties. Those allegations include that CISI knew the Trust's primary exposure to credit risk was the nonperformance of CISFS under the Forex Agreement.[118] Having CISFS handle the Forex program, however, created nearly a "risk-free" situation as to the funds the Trust had on deposit with CISFS, because it invested the Trust's cash conservatively and entered into forward contracts only with well-capitalized institutions and then entered into back-to-back contracts with the Trust. Due to the relatively low risk attendant to its deposits with CISFS, the Trust received an interest rate similar to that on a virtually "risk-free" United States Government security.

In contrast, Refco allegedly carried out its Forex operation in a much riskier way, using an unregulated Bermuda entity that was not subject, for example, to regulations such as those in the United States requiring the segregation of customer assets. As the Trust's counterparty, RCM allegedly did not enter into back-to-back trades with well-capitalized institutions, thereby increasing the Trust's counterparty risk. In addition, the Counterclaim alleges:

> On information and belief, by the time of the Refco Transaction, Refco's regular practice for many years had been to exploit RCM's status as an unregulated offshore entity by siphoning off its customer's funds to finance Refco's overall business operations and acquisitions, in-

---

**115.** For purposes of the aiding and abetting claim, it does not matter whether the underlying breach arises from common law fiduciary duties or duties created by the Trust Agreement. *See Fitzgerald v. Cantor,* 1999 WL 182573, at *1 (Del.Ch. Mar.25, 1999) ("Because a claim for aiding and abetting a breach of fiduciary duty is not dependent on the origin of the underlying fiduciary duty, a legal claim does exist for aiding and abetting a contractually created fiduciary duty.").

**116.** *See In re Gaylord Container Corp. S'holders Litig.,* 753 A.2d 462, 475 n. 41 (Del.Ch. 2000) (explaining that the Delaware Supreme Court has used "due diligence" as a proxy for

the "duty of care") (citing *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (Del.1989)).

**117.** Indeed, presumably to help explain to Unitholders what the Managing Owner's role was to be in managing the Trust, the Trust's Prospectus states the Managing Owner is the "functional equivalent of the general partner in a limited partnership." Aug. 2005 Prospectus at 71. I further note that 12 Del. C. § 3580 defines "good faith" in the trust context as "honesty in fact and observance of reasonable standards of fair dealing."

**118.** Aug. 2005 Prospectus at 27.

cluding, on information and belief, the Refco Transaction. On information and belief, no effort was made to hide this practice within Refco. In fact, on information and belief, the misappropriation of RCM customer assets was discussed openly among members of Refco's management. On information and belief, Cargill and [CIS] had at least inquiry notice of Refco's dishonesty and the risk posed to the Trust by transferring control over its assets to Refco and RCM.[119] In these circumstances, it is reasonable to expect that the Managing Owner of the Trust, which had the power to consent or not consent to a transfer of the Forex Agreement, would have looked into RCM's suitability to safeguard the Trust's assets.

That an investigation into Refco's suitability was warranted is further buttressed by CISI employees' expressions of incredulity and apprehension about the proposed sale to Refco based on Refco's negative reputation in the industry and repeated regulatory violations. The Counterclaim pleads facts detailing with specificity Refco's prior violations of regulations concerning customer accounts. Some of these violations are, as the Cargill Plaintiffs point out, rather dated, but taken together with more recent violations and the allegedly negative reaction of CISI employees, it is reasonable to infer that CISI was on inquiry notice that RCM might not be a suitable counterparty for the Trust Forex transactions.[120] If the facts alleged in the Counterclaim are true, they conceivably would support a finding that CISI violated its duty of care, as well as its duty to safeguard the Trust's assets.[121]

Indeed, accepting JWH's allegations as true, the employees of CIS and CISI knew about Refco's poor reputation and yet took no precautions to safeguard the Trust's assets. Similarly, the absence of any apparent reason for believing the transfer of the Forex Agreement to Refco would benefit the Trust could support a reasonable inference that no one considered the best

---

119. CC ¶ 92.

120. JWH ultimately may have difficulty proving that CISI should have known about the massive, overall fraud at Refco that came to light shortly after closing. Those issues, however, are not before me on the pending motions.

121. JWH claims the exculpation provision in § 18(a), discussed *supra* Part II.C.1, "imposes a simple negligence, rather than a gross negligence, standard of liability." DAB at 4. For the same reasons discussed in Part II.C.1, I am not convinced this provision imposes a standard of liability, especially when compared to the standard of liability the Trust Agreement provides for the Trustee: "The Trustee shall not be liable or accountable hereunder or under any other agreement to which the Trust is a party, except for the Trustee's gross negligence or willful misconduct." Trust Agreement § 2(f). Because the Cargill Plaintiffs have not advanced any argument that the outcome of their motions to dismiss and for judgment on the pleadings depends on whether the standard of liability for CISI is gross negligence rather than negligence, I defer that question for another day. In the meantime, for purposes of the pending motions I assume the applicable standard is gross negligence.

To the extent the Cargill Plaintiffs rely on *Terrydale Liquidating Trust v. Barness*, for the imposition of a gross negligence standard, that case is not entirely on point. 611 F.Supp. 1006, 1016 (S.D.N.Y.1984) (reviewing the trustee of a REIT's performance of its fiduciary duties under the corporate business judgment standard rather than the stricter standards of trust law). I read *Terrydale* as focusing on the "profit making responsibilities" of that particular business trustee, rather than what the court there characterized as the traditional role of the trustee: preservation of trust property. *Id.* Here, JWH's claim arguably is closer to a failure to preserve Trust assets held as deposits than a claim that CISI caused a diminution of the Trust's assets by making business judgments which resulted in losing commodities trades or the like.

interests of the Trust.[122] The Counterclaim further suggests that CISI did not conduct any independent legal or financial evaluation. In fact, one can reasonably infer that CISI did no investigation at all of Refco or RCM, despite having some knowledge about the dangers of allowing Refco to handle the Trust's assets.

Certain other facts alleged suggest that the failure to investigate may have occurred because CISI was acting primarily to close on the Refco Agreement, rather than looking out for the Trust's best interests. CISI CEO and CIS employee Davison's instructions to CISI employees to do everything necessary to facilitate the Refco Agreement, for example, could have been interpreted by his subordinates to mean they should do whatever they had to to make sure the transfer of the Forex Agreement occurred. That might have caused CISI to consent to the assignment of the Forex Agreement, regardless of the Trust's best interests. Cargill's agreement to prevent CISI from terminating the Forex Agreement with CISFS without Refco's consent also may support such an inference, but its relevance is more attenuated. Thus, for purposes of the pending motions, I find the Counterclaim supports a reasonable inference that the Managing Owner, CISI, breached its fiduciary duties of care and loyalty to the Trust, when it approved the assignment of the Forex Agreement to Refco's affiliate, RCM.

### 3. Does the Counterclaim Adequately Allege that Cargill or CIS Knowingly Participated in CISI's Breach?

Cargill and CIS knew that CISI had fiduciary duties to the Trust. Indeed, by agreeing to "cause" CIS and CISFS to transfer the Forex Agreement, while only agreeing to use "best efforts" to obtain CISI's consent, Cargill effectively acknowledged in the Refco Agreement the existence of CISI's fiduciary duties. Cargill's agreement to prevent CISI from terminating the Forex Agreement prior to closing without Refco's consent and the actions of CISI's CEO, who was also an employee of CIS, in suggesting to CISI that it should do everything necessary to transfer of the Forex Agreement demonstrates the Cargill Plaintiffs' participation in the challenged conduct. Moreover, Cazenave, a CISI Vice President and CIS employee, consummated the consent. I, therefore, find that JWH has alleged enough specific facts to support a reasonable inference that Cargill and CIS knowingly participated in CISI's alleged breach of its fiduciary duties by consenting to the assignment of the Forex Agreement to facilitate a transaction for the benefit of the Cargill Plaintiffs without regard to the Trust's interests.

### 4. Does the counterclaim adequately allege that damages to the Trust resulted from the concerted action of CISI and the Cargill Plaintiffs?

If true, JWH's allegations support a reasonable inference that the transfer of the Forex Agreement led to Trust losses. But for CISI's consent, the Trust's assets on deposit with CISFS under the Forex Agreement would not have been transferred to RCM. In that case, Refco would not have been able to dissipate the Trust's assets as it did. Whether the entire amount of the Trust's loss (over $30 million) can be attributed to CISI's consent to the Forex Agreement is not before me at the motion to dismiss stage. In addition, JWH has alleged facts leading to a reasonable inference that the Trust also was damaged by the transfer to the extent the

---

122. The Trust Agreement states that the "Managing Owner will take no actions with respect to the property of the Trust which do not benefit the Trust." Trust Agreement § 9(b).

Trust failed to receive any increase in the interest rate paid on the Trust's deposits with RCM despite the allegedly obvious increased risk of dealing with RCM, as opposed to CISFS.[123]

### F. Has JWH Stated a Claim for Negligence against Cargill or CIS in Connection with Sale of Control of the Trust and its Assets (Counts Five and Six)?

Counts Five and Six of the Counterclaim assert general negligence claims against the Cargill Plaintiffs. JWH cites a single case, *Harris v. Carter*, for the proposition that those who control an entity owe a duty to the entity's constituents to perform proper due diligence during a sale of the entity, when the circumstances would alert a reasonably prudent person to a risk that the buyer will harm the underlying entity.[124] According to JWH, Cargill and CIS are liable on this general negligence theory for selling control of the Trust and its assets to Refco when they were on inquiry notice that Refco would loot the Trust.

The Cargill Plaintiffs make three arguments in response. First, they contend that a claim for negligence is foreclosed by Section 18 of the Trust Agreement, but I already have rejected that argument.[125] Second, the Cargill Plaintiffs argue that JWH cannot demonstrate any underlying duty, because the *Harris* case and two other similar cases concern duties owed by controlling shareholders—not corporate parents of fiduciaries.[126] And third, the Cargill Plaintiffs contend that JWH has not alleged facts demonstrating that Cargill or CIS were alerted to a risk that Refco was dishonest.

■ I find the latter argument unconvincing for the same reasons stated previously in regard to the adequacy of the allegations that employees of Cargill and CIS were on at least inquiry notice of the increased risks associated with Refco. The second argument goes to the applicable standard of liability for Cargill and CIS in the circumstances of this case. I consider it premature to attempt to resolve that issue on the less than complete legal and factual record currently before me. As stated in Part II.C–D *supra*, the precise nature of the duties of parents and grandparents of fiduciaries of underlying entities in a scenario like this one and the applicable standards of review or liability were not well developed in the context of the pending motion. That is understandable based on the plethora of other issues raised by the motion and the lack of much precedent relating to statutory trusts. Nevertheless, those issues deserve careful consideration and will benefit from further development of the record. Moreover, the overlap between the issues raised by Counts Five and Six and the other counts for which I have held additional proceedings are necessary makes it unlikely that any significant benefit in terms of increased efficiency or reduced costs would be achieved from attempting to resolve Counts Five and Six on a less than optimal record. Thus, I decline to dismiss either of those counts at this preliminary stage of the litigation.

---

**123.** If the damages were limited to the difference in the interest rate the Trust should have received, given the increased risk, and the "risk-free" rate it did receive, the damages presumably would be small relative to the entire amount lost by the Trust, because RCM only held the Trust assets for a short period of time before the deficiency at RCM was discovered.

**124.** 582 A.2d 222, 235 (Del.Ch.1990).

**125.** *See supra* Part II.C.1.

**126.** *See* PRB at 18, citing *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 758 (Del.Ch. 2006); *Cooke v. Oolie*, 2000 WL 710199, at *16 (Del.Ch. May 24, 2000); *Harris,* 582 A.2d at 234.

## III. CONCLUSION

For the reasons stated, I deny the Cargill Plaintiffs' motion to dismiss and motion for judgment on the pleadings in all respects.

**IT IS SO ORDERED.**