# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GRAND ACQUISITION, LLC,     )
     )
     Plaintiff,     )
     )
     v.     )     C.A. No. 12003-VCMR
     )
PASSCO INDIAN SPRINGS DST,     )
a Delaware Statutory Trust Company,     )
     )
     Defendant.     )

## OPINION

Date Submitted:  June 30, 2016
Date Decided:  August 26, 2016
Date Revised:  September 7, 2016

R. Karl Hill, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware; *Attorney for Plaintiff*.

John L. Reed, Ethan H. Townsend, and Harrison S. Carpenter, DLA PIPER LLP, Wilmington, Delaware; *Attorneys for Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, a beneficial owner of a Delaware statutory trust seeks to inspect certain of the trust's books and records. The beneficial owner requested inspection under both Section 5.3(c) of the trust's governing agreement and 12 *Del. C.* § 3819, the books and records provision of the Delaware Statutory Trust Act. The trust denied the beneficial owner's request, arguing that the form of the request and the motivations underlying the request both were improper. The bulk of the parties' dispute centers on whether the trust agreement incorporates the statutory requirements of 12 *Del. C.* § 3819 and, if so, whether the beneficial owner has satisfied those requirements. The parties also dispute the scope of the contractual books and records right and the propriety of the trust's statutory and contractual affirmative defenses.

Both parties have moved for summary judgment. For the reasons stated in this Opinion, I grant the beneficial owner's motion for summary judgment and deny the trust's motion for summary judgment.

## I. BACKGROUND[1]

### A. Parties

Plaintiff Grand Acquisition, LLC ("Grand Acquisition") is a Nevada limited liability company that owns 0.185874 percent of Defendant Passco Indian Springs DST's ("Passco Trust" or the "Trust") Class A interests. Passco Trust is a Louisville, Kentucky-based Delaware statutory trust ("DST") that was formed on or around July 27, 2011. The Trust owns an apartment complex in Louisville called The Legends of Indian Springs Apartments and is managed administratively by non-party Passco Indian Springs Manager, LLC ("Passco Manager"). Passco Manager is owned and controlled by non-party Passco Companies, LLC ("Passco Parent").

### B. Facts

On September 30, 2015, Grand Acquisition sent Passco Trust a letter (the "Demand") demanding to inspect and make copies of the current list of the Trust's beneficial owners (the "Owners"), those Owners' contact information, and their respective ownership interests in the Trust (collectively, the "Requested Information").[2] On October 28, 2015, Passco Trust denied the Demand, noting

---

[1] The facts are drawn from the pleadings and the evidence submitted by the parties. *See* Ct. Ch. R. 56(c).

[2] Trans. Aff. of Harrison S. Carpenter ("Carpenter Aff.") Ex. A.

that it "takes its obligations to protect the confidential nature of the information provided by the investors and related books and records very seriously."[3] Passco Trust also requested that Grand Acquisition "provide the basis for [its] request" because "[u]nder Delaware statutory law, such information cannot be released unless there is a reasonable basis for such action" that is "related to the beneficial owner's interest as a beneficial owner of the statutory trust."[4]

On December 18, 2015, Grand Acquisition sent a follow up letter to Passco Trust (the "Supplemental Demand") and maintained that the Delaware Statutory Trust Act (the "DST Act")[5] allows a trust "unfettered freedom to modify or eliminate" the "reasonable basis" requirement regarding a books and records demand.[6] According to Grand Acquisition, Section 5.3(c) of the Amended and Restated Trust Agreement dated and effective as of November 17, 2011 (the "Trust Agreement"), the Trust Agreement's books and records provision ("Section 5.3(c)"),[7] does just that and applies "broadly and without limitation []and specifically without incorporating any of the permissive preconditions under" 12

---

[3]     Carpenter Aff. Ex. B.

[4]     *Id.*

[5]     12 *Del. C.* §§ 3801-3826.

[6]     Carpenter Aff. Ex. C.

[7]     Carpenter Aff. Ex. E ("Trust Agreement") § 5.3(c).

3

*Del. C.* § 3819 ("Section 3819").[8]  Nonetheless, Grand Acquisition stated that the Owners may inspect the Trust's books and records "for the purpose of communicating with other [Owners], which communications may include offering to acquire additional beneficial ownership interests, discussing the operations of Passco DST, and discussing other matters relating to the [Owners'] investment in Passco DST."[9]  Further, Grand Acquisition contended that "[i]n both the alternative entity context as well as under the more stringent corporate books and records standard, Delaware courts uniformly have held that stockholder or member communications with other investors relating to the investment is a presumptively proper (or reasonable) purpose."[10]  Passco Trust did not respond to Grand Acquisition's Supplemental Demand.

### C.  Procedural History

On February 16, 2016, Grand Acquisition filed its verified complaint, seeking to inspect and make copies of the Requested Information (the "Complaint").  Grand Acquisition asserts both a contractual demand under Section 5.3(c) (the "Contractual Demand") and a statutory demand under Section 3819 (the "Statutory Demand").

---

[8]  Carpenter Aff. Ex. C.

[9]  *Id.*

[10]  *Id.*

Passco Trust filed its Answer and Defenses to the Complaint on March 22, 2016, challenging Grand Acquisition's right to inspect the Requested Information under Section 3819 or the Trust Agreement (the "Answer").[11]  The parties then performed discovery, agreed to resolve this case through cross motions for summary judgment, and filed simultaneous opening and answering briefs.  On June 30, 2016, I heard oral argument on the cross motions for summary judgment.  This Opinion contains my ruling on those cross motions.

## D.      Parties' Contentions

Grand Acquisition makes two alternative arguments as to why it is entitled to the Requested Information.   First, under its Contractual Demand, Grand Acquisition contends that Section 5.3(c) grants the Owners access to the Trust's books and records—including the Requested Information—without application of any of Section 3819's statutory preconditions and defenses.  Second, under its Statutory Demand, Grand Acquisition contends that it has satisfied Section 3819's preconditions to accessing the Trust's books and records and that Passco Trust's statutory defenses under Section 3819 are meritless.

Passco Trust responds that although the Trust Agreement does not mention Section 3819's preconditions and defenses, it has not affirmatively disavowed

---

[11]      Answer at 9.

them, and therefore, they still apply. Thus, Passco Trust contends that Grand Acquisition is not entitled to the Requested Information because (1) Grand Acquisition has not complied with Section 3819's procedural requirements, (2) Grand Acquisition's stated purpose is not a proper purpose, (3) the Requested Information is subject to third-party confidentiality agreements, and (4) Passco Manager has a good faith belief that revealing the Requested Information to Grand Acquisition is not in Passco Trust's best interests. Alternatively, if the Trust Agreement eliminates Section 3819's preconditions and defenses, then Passco Trust asserts an "improper purpose defense," arguing that Grand Acquisition seeks the Requested Information for a personal purpose that is adverse to Passco Trust's interests. Passco Trust also maintains that because the Trust Agreement includes the Requested Information in the defined term "Ownership Records," and because such Ownership Records are not included in Section 5.3(c), the Owners plainly are not entitled to the Requested Information under Section 5.3(c).

## II. ANALYSIS

### A. Standard of Review

Under Court of Chancery Rule 56(h),

> [w]here the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the

6

equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[12]

In such situations, "the usual standard of drawing inferences in favor of the nonmoving party does not apply."[13] Because there are no disputes of material fact and the parties have agreed that this case should be resolved at the summary judgment stage,[14] I treat their cross motions as a stipulation for decision on the merits on the record submitted.[15] The "preponderance of the evidence" standard, therefore, applies to Grand Acquisition's claims and Passco Trust's affirmative defenses.[16] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the

---

[12] Ct. Ch. R. 56(h).

[13] *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18 (Del. Ch. 2005) (citing Ct. Ch. R. 56(h)), *aff'd*, 903 A.2d 728 (Del. 2006).

[14] *See* Amended Stipulation & Order to Govern Case Schedule, Docket Item No. 14.

[15] *See Am. Legacy Found.*, 886 A.2d at 18 ("[U]nder Court of Chancery Rule 56(h), since neither party argues that there is a disputed material issue of fact, the court deems the cross-motions to be the equivalent of a stipulation for decision on the merits on the record submitted.").

[16] *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *2 (Del. Ch. May 28, 2015) ("After a trial, the party seeking relief generally has the burden of showing entitlement to that relief by a preponderance of the evidence. Here, the 'trial' effectively consisted of oral argument based upon a stipulated record. In that sense, this case procedurally is more analogous to a matter submitted on cross motions for summary judgment.").

7

evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[17]

## B. Grand Acquisition Is Entitled to the Requested Information Under Its Contractual Demand

Grand Acquisition is entitled to the Requested Information under its Contractual Demand for the following three reasons: (1) the Owners' contractual right to the Trust's books and records under Section 5.3(c) is not subject to Section 3819's preconditions and defenses; (2) Section 5.3(c) does not exclude Ownership Records—which encompass the Requested Information—from the books and records to which the Owners are entitled; and (3) Passco Trust has failed to prove its improper purpose defense.

### 1. The Owners' right to books and records under the Trust Agreement is not subject to the DST Act's preconditions and defenses

This Court consistently has treated a contractual books and records right provided in a limited liability company's ("LLC") or a limited partnership's ("LP") governing instrument as independent from the relevant default statutory right.[18] As

---

[17] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[18] *See, e.g.*, *Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 853 (Del. Ch. 1999) (concluding that an LP's partnership agreement entitled limited partners to a contractual books and records right that "is in addition to and separate from the right to obtain information from the Partnership pursuant to

8

then-Vice Chancellor Steele held in *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*,

> it is not necessary for . . . partnership provisions to include explicit language that they are creating contractual rights separate and independent of statutory rights in order for those provisions to in fact create a separate and independent contractual right. Rather, where a provision in a partnership agreement appears on its face to create a right separate and independent from a statutory right or a right granted in another section of the partnership agreement, the partnership agreement must explicitly state that the provision is merely clarifying or placing additional conditions on the other statutory or contractual right if in fact that is the provision's intended purpose. Otherwise, this Court will conclude that the parties intended the provision to create the separate and independent contractual right that the provision on its face purports to create.[19]

---

Section 17-305"—*i.e.*, the statutory right); *see also Madison Real Estate Immobilien-Anlagegesellschaft Beschrankt Haftende KG v. Kanam USA XIX Ltd. P'ship*, 2008 WL 1913237, at *4 n.33 (Del. Ch. May 1, 2008) ("The statutory and contract claims could have been interdependent, if the contract had specifically invoked § 17-305, but [the relevant contractual provision] does not mention § 17-305. In any event, a partnership agreement can create a contractual inspection right 'in addition to and separate from' the statutory inspection right." (quoting *Bond Purchase*, 746 A.2d at 853)); *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681, at *4 n.9 (Del. Ch. Jan. 29, 2002) (extending the holding in *Bond Purchase* to the LLC context); *In re Paine Webber Ltd. P'ships*, 1996 WL 535403, at *1 (Del. Ch. Sept. 17, 1996) ("*Paine Webber I*") ("The Court concludes that, in these particular circumstances, (1) the plaintiffs do not have a statutory right to the lists, because they have not established a proper statutory purpose as required by 6 *Del. C.* § 17-305; and (2) the plaintiffs do have a contractual right to the lists under the applicable Partnership Agreements.").

[19]    746 A.2d at 855.

Similarly, this Court has indicated that providing an entity's owners with an unconditional contractual right to inspect that entity's books and records has the practical impact of rendering the relevant statutory preconditions and defenses inapplicable to that independent contractual right.[20] Although no such cases have been decided regarding a DST, this Court's decisions involving LLCs and LPs often cite one another on the basis that "[t]he Delaware [LLC] Act has been modeled on the popular Delaware LP Act."[21] That same principle applies to

---

[20] *See, e.g.*, *Arbor Place*, 2002 WL 205681, at *4 n.9 ("Although the statute provides for a good faith defense to a statutory claim for production of books and records, this does not appear to be the proper standard to apply in response to a contractual claim to inspect books and records." (citation omitted)); *Bond Purchase*, 746 A.2d at 850-64 (applying the Delaware LP Act's proper purpose requirement and good faith defense to the statutory books and records right, but not to the contractual books and records right); *In re Paine Webber Qualified Plan Prop. Fund Three, L.P. Litig.*, 698 A.2d 389, 392 (Del. Ch. 1997) ("*Paine Webber II*") ("[P]laintiffs are not required to demonstrate a proper purpose to enforce their contractual rights to the partnership lists because the partnership agreements of these four partnerships do not contain an express requirement concerning purpose."); *Paine Webber I*, 1996 WL 535403, at *5-6 ("[T]his Court should *not* read [the Delaware LP Act's statutory requirement of a proper purpose] into a partnership agreement that grants a limited partner access to partnership information without requiring a demonstration of proper purpose."); *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*, 685 A.2d 365, 375 (Del. Ch. 1996) ("It is to be noted that . . . the partnership agreements . . . [do not] contain an express limit concerning 'purpose' and thus *in each instance one must begin with the recognition that a partner has no obligation to prove that it has a 'proper purpose' in order to enforce one of these rights to the prescribed access*.").

[21] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999); *see also Arbor Place*, 2002 WL 205681, at *4 n.9 ("Reliance on a limited partnership case is appropriate because Delaware's LLC Act was 'modeled on the popular LP Act. In fact, its architecture and much of its wording is almost identical to that of the Delaware LP Act.'" (quoting *Elf Atochem*, 727 A.2d at 290)).

10

DSTs,[22] making it appropriate to apply the holdings in LLC and LP cases to DSTs, at least in this context. Hence, the relevant question is whether the Trust Agreement grants the Owners an independent books and records inspection right that does not incorporate any of the preconditions or defenses in Section 3819.

Section 5.3(c) expressly entitles the Owners to "inspect, examine and copy the Trust's books and records," subject only to the condition that such inspection, examination, and copying be done "during normal business hours."[23] Because Section 5.3(c) does not expressly include Section 3819's preconditions and defenses, the LLC- and LP-related case law[24] suggests that the Trust Agreement grants the Owners an unconditional right to inspect Passco Trust's books and records.

---

[22] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 669 (Del. Ch. 2012) ("[T]he LP Act declares as public policy the goal of granting the broadest freedom of contract possible. Other Delaware alternative entity statutes, including the LLC Act and *the Delaware Statutory Trust*[] *Act*, are modeled on the LP Act . . . and adopt the same policy of maximizing freedom of contract." (emphasis added) (footnotes omitted)); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1111 n.60 (Del. Ch. 2008) ("[T]he policy regarding statutory trusts [giving maximum effect to the principle of freedom of contract and to the enforceability of governing instruments] is consistent with that for other alternative business entities. This can be seen in the Delaware Revised Uniform Limited Partnership Act ('DRULPA'). Similarly, the Delaware Limited Liability Company Act explicitly embodies a policy of giving 'the maximum effect . . . to the enforceability of limited liability company agreements.'" (citations omitted) (citing 6 *Del. C.* § 17-1101(c)) (quoting 6 *Del. C.* § 18-1101(b))).

[23] Trust Agreement § 5.3(c).

[24] *See supra* note 20.

According to Passco Trust, however, *Cargill, Inc. v. JWH Special Circumstance LLC*[25] indicates that a DST's governing instrument must expressly disclaim Section 3819's preconditions and defenses for them to be rendered inapplicable.[26] In *Cargill*, Vice Chancellor Parsons held that the prefatory phrase "[e]xcept to the extent otherwise provided in the governing instrument"—which also appears in Section 3819—indicates that "in the absence of language in the governing instrument . . . to the contrary," the DST Act's default provisions apply.[27] Passco Trust contends, therefore, that Grand Acquisition's position that "the general 'books and records' provision of the Trust Agreement overrides the Act because it addresses the subject matter of books and records and does not mention a proper purpose requirement, confidentiality, or grant certain powers to the manager . . . is flat wrong."[28] From Passco Trust's standpoint, the Owners' broad books and records right under Section 5.3(c) is tantamount to "silence"

---

[25]     959 A.2d 1096.

[26]     Def.'s Opening Br. 37 ("Indeed, whereas the remainder of Section 5.3(c) defines such parameters, the sentence on which Grand Acquisition relies emphasizes only *when* members can carry out an inspection; it does not provide for the wholesale elimination of Section 3819's demand requirements. Nothing in the Trust Agreement is expressly 'contrary' to the Act, per *Cargill*.").

[27]     959 A.2d at 1116 (citing 12 *Del. C.* § 3809).

[28]     Def.'s Opening Br. 6.

regarding Sections 3819(a)[29] and (c),[30] which does not, as a matter of law, constitute "contrary" language.[31]

Yet, Passco Trust ignores the context in which the holding in *Cargill* arose. In *Cargill*, a DST's representative brought fiduciary duty claims against the trust's managing owner.[32] The representative also brought fiduciary duty claims against the managing owner's parent and grandparent companies "based on a line of partnership cases beginning with *In re USACafes, L.P. Litigation*," which "deal with the fiduciary duties owed by those that control a fiduciary of an underlying

---

[29]    12 *Del. C.* § 3819(a) (stating that "[e]xcept to the extent otherwise provided in the governing instrument," a beneficial owner must have a "purpose reasonably related to the beneficial owner's interest as a beneficial owner of the statutory trust" to inspect the trust's books and records).

[30]    *Id.* § 3819(c) (providing that "[e]xcept to the extent otherwise provided in the governing instrument, the trustees or other persons who have authority to manage the business and affairs of the statutory trust" may withhold any information from the trust's beneficial owners "the disclosure of which such persons in good faith believe is not in the best interest of the statutory trust or could damage the statutory trust or its business or which the statutory trust is required by law or by agreement with a third party to keep confidential").

[31]    Def.'s Opening Br. 7 ("In Grand Acquisition's view, _silence_ equates to 'otherwise provided,' but the Trust's view is the view shared by this Court. That is, 'otherwise provided' means '_otherwise_ provided': '[I]n the absence of language in the governing instrument or the Act itself _to the contrary_, this Court must apply the statutory and common law relating to trusts.' *Cargill, Inc. v. JWH Special Circumstances LLC*, 959 A.2d 1096, 1116 (Del. Ch. 2008) (emphasis added). There is nothing in the Trust Agreement that is 'to the contrary' of what is provided for in Sections 3819(a) and (c). The *Cargill* case ends Grand Acquisition's case as a matter of law.").

[32]    *Cargill*, 959 A.2d at 1099.

13

entity."[33]  In response, the managing owner, its parent, and its grandparent argued that "the [DST] Act creates a kind of *sui generis* entity for which virtually no default duties are implied by the Act or the common law," and "in the absence of any positive statement in the Trust Agreement explicitly attributing fiduciary duties to a corporate parent of a fiduciary, such a corporate parent would not owe any duty to the statutory trust whatsoever."[34]  In rejecting that contention, Vice Chancellor Parsons noted as follows:

> [T]he [DST] Act generally does not create duties or specify mandatory standards of review or liability, but rather references certain default principles, such as: "Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts . . . ."  Thus, in the absence of language in the governing instrument or the Act itself to the contrary, this Court must apply the statutory and common law relating to trusts.[35]

Vice Chancellor Parsons further noted that rather than addressing the scope of the applicable fiduciary duties, the relevant provision in the trust agreement addressed only the circumstances under which the managing owner and its affiliates could be

---

[33]     *Id.* at 1110.

[34]     *Id.*

[35]     *Id.* at 1116 (footnote omitted) (quoting 12 *Del. C.* § 3809).

14

exculpated from liability for a fiduciary breach.[36] As a result, Vice Chancellor Parsons held that the default fiduciary duties apply because the trust agreement "simply does not address whether [the managing owner's parent and grandparent] owed any fiduciary duty to the Trust."[37]

The Trust Agreement here, however, is not silent as to the Owners' books and records inspection right in the same way that the trust agreement in *Cargill* was silent as to the managing owner's fiduciary duties. A more apt analogy would be if the Trust Agreement did not create a books and records inspection right at all and, based on that absence, Grand Acquisition contended that because Section 3819's preconditions and defenses were not included, the Trust Agreement eliminated them. That is not the situation here. Section 5.3(c) provides the Owners with an unqualified contractual right to the Trust's books and records, which is contrary to Section 3819's qualified statutory right. This case, therefore, is distinguishable from *Cargill*.

Passco Trust also asserts that its argument that the Trust Agreement must expressly disclaim Section 3819 to avoid its preconditions and defenses "is buttressed by considering" the differences between Section 3819 and the LLC and

---

[36]    *Id.* at 1115-16.

[37]    *Id.*

LP Acts.[38] Passco Trust highlights the fact that Section 3819's language is nearly identical to the language in 6 *Del. C.* § 18-305 ("Section 18-305") and 6 *Del. C.* § 17-305 ("Section 17-305"), the LLC and LP analogs of Section 3819, respectively.[39] The major difference between those three sections is the prefatory phrase in subsections (a) and (c) of Section 3819,[40] which is absent from both Sections 18-305[41] and 17-305.[42] On the basis of that distinction, and to avoid "render[ing] the prefatory clause meaningless," Passco Trust asserts that "unlike the LLC Act and DRULPA, the [DST] Act *does* provide a series of default

---

[38]   Def.'s Opening Br. 34.

[39]   *See id.* at 35.

[40]   *See* 12 *Del. C.* § 3819(a) ("Except to the extent otherwise provided in the governing instrument of a statutory trust, each beneficial owner of a statutory trust, in person or by attorney or other agent, has the right . . . ."), (c) ("Except to the extent otherwise provided in the governing instrument of a statutory trust, the trustees or other persons who have authority to manage the business and affairs of the statutory trust shall have the right to keep confidential from the beneficial owners . . . .").

[41]   6 *Del. C.* § 18-305(a) ("Each member of a limited liability company, in person or by attorney or other agent, has the right . . . ."), (c) ("The manager of a limited liability company shall have the right to keep confidential from the members . . . .").

[42]   6 *Del. C.* § 17-305(a) ("Each limited partner, in person or by attorney or other agent, has the right . . . ."), (b) ("A general partner shall have the right to keep confidential from limited partners . . . .").

16

provisions for a books and records action, each of which the governing document _must_ expressly alter."[43]

Although Passco Trust would have me read the prefatory clause to mean that the Trust Agreement must affirmatively disclaim Section 3819's preconditions and defenses in order to avoid them, I interpret that clause differently. Sections 18-305 and 17-305 both have nearly identical subsections allowing an LLC's or LP's governing document to restrict the inspection rights granted under that section.[44]

---

[43] Def.'s Opening Br. 36 (citing _Lukk v. State Farm Mut. Auto. Ins. Co._, 2014 WL 4247767, at *4 (Del. Super. Aug. 27, 2014), _corrected by_ (Del. Super. Aug. 29, 2014) ("When different words are used in two clauses like this it must be presumed different meanings are intended."); _States Roofing Corp. v. Winter_, 587 F.3d 1364, 1370-72 (Fed. Cir. 2009) (applying the canon of statutory interpretation: "different terms are presumed to have different meanings")). This Court's 1998 decision _Nakahara v. The NS 1991 American Trust_, 739 A.2d 770 (Del. Ch. 1998), confirms that because the DST Act, the LLC Act, and the LP Act are related statutory schemes modeled on one another, it is appropriate to compare Section 3819 to Sections 18-305 and 17-305.

In _Nakahara_, the Court declined to draw any inferences regarding the Delaware General Assembly's intent in drafting the DST Act based on differences between that Act and the Delaware General Corporation Law (the "DGCL") because "the two statutes are simply too different to draw _any_ conclusions from a comparison of their various provisions." _Id._ at 781. The Court noted, however, that "[h]ad the General Assembly, in crafting the [DST Act], instead adopted wholesale the headings and format of the [DGCL]—or even of the [DGCL's] indemnification provision—I might be more persuaded that the dissimilarity between the indemnification provisions of the [DST Act] and the [DGCL] was meaningful." _Id._ at 782. In other words, "[w]ith all else the same, a single difference would have more meaning." _Id._

[44] _See_ 6 _Del. C._ § 18-305(g) ("The rights of a member or manager to obtain information as provided in this section may be restricted in an original limited liability company agreement or in any subsequent amendment approved or

17

Section 3819 has no equivalent subsection.  Instead, the prefatory clause in Section 3819 is what indicates that a DST's governing document may restrict the inspection rights granted under that section.  To the extent that Sections 3819, 18-305, and 17-305 mirror each other, the prefatory clause in Sections 3819(a) and (c) serves the same purpose as Sections 18-305(g) and 17-305(f).

Thus, there is no basis on which I can conclude that because of the prefatory clause, the Trust Agreement must expressly disclaim Section 3819's preconditions and defenses for them to be rendered inapplicable.  I conclude, therefore, that under the Trust Agreement, (1) the Owners can inspect the Trust's books and records without complying with Section 3819's procedural and proper purpose requirements and (2) Passco Trust cannot withhold its books and records on the basis that the Requested Information is subject to third-party confidentiality agreements or that Passco Manager has a good faith belief that revealing the Requested Information to Grand Acquisition is not in Passco Trust's best interests.

adopted by all of the members or in compliance with any applicable requirements of the limited liability company agreement."); 6 *Del. C.* § 17-305(f) ("The rights of a limited partner to obtain information as provided in this section may be restricted in an original partnership agreement or in any subsequent amendment approved or adopted by all of the partners or in compliance with any applicable requirements of the partnership agreement.").

## 2. The Owners' right to books and records under the Trust Agreement includes the Requested Information

Because Grand Acquisition's right to inspect Passco Trust's books and records under Section 5.3(c) is contractual, the Trust Agreement establishes the scope of the books and records to which Grand Acquisition is entitled.[45] The Trust Agreement does not define the term "books and records," but it defines the term "Ownership Records" to include "the name, mailing address and Percentage Share of each Owner,"[46] which is the information that Grand Acquisition seeks here. Section 5.3(c), however, does not expressly state that Owners may inspect Ownership Records. Instead, the Trust Agreement only mentions Ownership Records in Section 5.3(i), which obligates Passco Manager to "provide to the Trustee a copy of the Ownership Records promptly after each revision thereto."[47] According to Passco Trust, therefore, the doctrine of *expressio unius* dictates that because "Ownership Records" is a defined term that includes the Requested Information and because Section 5.3(c) does not include Ownership Records among the "books and records" that Owners are entitled to inspect, the Trust

---

[45] *See Bond Purchase*, 746 A.2d at 855 ("Having concluded that Section 14.1 grants . . . a contractual right to inspect, examine and copy the Partnership's 'books and records' at all times, I must determine whether the term 'books and records' encompasses the Investor List.").

[46] Trust Agreement § 1.1.

[47] *Id.* § 5.3(i).

Agreement intentionally excluded the Requested Information from the scope of the Owners' contractual inspection right. Passco Trust maintains that under Section 5.3(i), only the Trustee may inspect the Ownership Records. And, Passco Trust asserts that Section 5.3(c)'s other clauses regarding Passco Manager's obligations as to the books and records[48] "show[] that the 'books and records' contemplated thereby relate to financial information about *the Trust* (not its Owners)."[49]

Although Passco Trust's argument does have some logical appeal, I disagree that the Trust Agreement excludes the Requested Information from the contractual inspection right in Section 5.3(c). A plain reading of Section 5.3(i) indicates that it requires Passco Manager to "provide to the Trustee a copy of the Ownership Records promptly after each revision thereto" rather than creating an exclusive inspection right in favor of the Trustee.[50] In addition, the definition of Ownership Records indicates that Passco Manager is obligated to revise those Records and

---

[48] *Id.* § 5.3(c) (requiring the Manager to "keep customary and appropriate books and records relating to the Trust and the Trust Estate," "obtain annual audited financial reports for the Trust," "keep customary and appropriate books and records of account for the Trust," and "maintain appropriate books and records in order to provide reports of income and expenses with respect to the Trust Estate").

[49] Def.'s Opening Br. 48-49.

[50] Trust Agreement § 5.3(i).

maintain them in accordance with Exhibit C to the Trust Agreement.[51]  Both

Section 5.3(i) and the defined term "Ownership Records," therefore, seem wholly

unrelated to the Owners' inspection right in Section 5.3(c).  They simply impose

affirmative obligations on Passco Manager regarding the maintenance and revision

of the Ownership Records.

Similarly, rather than defining the scope of the Owners' inspection right, the

other provisions in Section 5.3(c)[52] impose affirmative obligations on Passco

Manager regarding the maintenance of certain specific books and records.  In fact,

the opening sentence of Section 5.3(c) indicates that "books and records" should be

defined by their "customary" meaning.[53]  Certainly, a DST's customary "books

and records" include the Requested Information, as Section 3819 expressly

includes "[a] current list of the name and last known business, residence or mailing

address of each beneficial owner and trustee."[54]  "If [Passco Trust] wished to bar

---

[51]   *Id.* § 1.1 ("'Ownership Records' means the records maintained by the Manager, substantially in the form as set forth on Exhibit C, indicating from time to time the name, mailing address and Percentage Share of each Owner, which records shall be revised by the Manager contemporaneously . . . .").

[52]   *See supra* note 48.

[53]   Trust Agreement § 5.3(c) ("The Manager shall keep *customary* and appropriate books and records relating to the Trust and the Trust Estate . . . ." (emphasis added)).

[54]   12 *Del. C.* § 3819(a)(2); *see also Arbor Place*, 2002 WL 205681, at *3 & n.6 (holding that the "LLCs' member lists fall within the broad language of [the LLC

21

access to the names and addresses of [Owners], it could have done so explicitly in the" Trust Agreement.[55] Simply creating affirmative obligations to maintain, revise, or provide certain documents that may be considered "books and records" does not, without more, operate to limit the Owner's contractual inspection right under Section 5.3(c).[56] I conclude, therefore, that Grand Acquisition's contractual inspection right under the Trust Agreement includes the Requested Information.

### 3. Passco Trust has failed to prove its implied improper purpose defense

Passco Trust asserts an implied "improper purpose defense" as its final basis for denying Grand Acquisition's demand to inspect the Requested Information. The improper purpose defense was first articulated in Chancellor Allen's 1996

---

agreements' books and records provisions] as they are clearly understood to be 'records' of the company" based, in part, on the fact that "one item on the list of records in § 18-305 is '[a] current list of the name and last known business, residence or mailing address of each member and manager'"); Def.'s Answering Br. 24 ("The Trust does not disagree that, under Section 3819, a trust's 'books and records' would generally include a list of investors. Indeed, the same is true under the LLC Act and the DRULPA.").

[55] *Parkcentral Global, L.P. v. Brown Inv. Mgmt., L.P.*, 1 A.3d 291, 296 (Del. Ch. 2010).

[56] *See RED Capital Inv. L.P. v. RED Parent LLC*, 2016 WL 612772, at *3 (Del. Ch. Feb. 11, 2016) ("Section 10.2(d) provides, in turn, that Company officers shall prepare and deliver to Managers monthly management reports and an annual audited balance sheet, income statement, and cash flow statement. This latter provision does not, contrary to RED Parent's position, restrict a Manager's access to information; requiring officers to prepare and deliver certain information to Managers does not, without more, limit a Manager's access to additional information." (footnotes omitted)).

decision *Schwartzberg v. CRITEF Associates Limited Partnership.*[57]    In

*Schwartzberg*, Chancellor Allen stated, in the context of a limited partner's request

to inspect a list of the partnership's partners, as follows:

> In the absence of an explicit contractual provision or statutory language to the contrary, and in circumstances in which, as here, a partner denying another partner access to partnership business records can show that the partner seeking access is doing so for a purpose personal to that partner and adverse to the interests of the partnership considered jointly, the court is warranted in denying the request for access.[58]

Therefore, Passco Trust must prove by a preponderance of the evidence that (1) no

provision in the Trust Agreement explicitly negates the proper purpose

requirement, (2) Grand Acquisition seeks the Requested Information for a personal

purpose, and (3) granting Grand Acquisition the right to inspect the Requested

Information actually would be adverse to the Trust's interests.[59]

As an initial matter, there is an open issue as to whether the improper

purpose defense applies here.  Although Passco Trust argues that the improper

---

[57]    685 A.2d 365 (Del. Ch. 1996).

[58]    *Id.* at 377.

[59]    *See Bond Purchase*, 746 A.2d at 857 ("Under the 'improper purpose defense,' this court is warranted in denying a partner's request for access to a partnership's records when (i) neither an explicit contractual provision in a partnership agreement nor statutory language negate the notion that partner must have a proper purpose and (ii) the partner denying another partner access to partnership business records can show that the partner seeking access is doing so for a purpose personal to that partner and adverse to the interest of the partnership considered jointly.").

23

purpose defense should apply to DSTs as it does to LLCs and LPs,[60] it acknowledges that "no Delaware court has addressed [whether the improper purpose defense applies] in the Delaware Statutory Trust context."[61] And, Grand Acquisition contends that because "the Trust Agreement contains a controlling provision that entitles it to the information requested with no condition," "there is no basis to imply an improper purpose defense."[62] In any event, I need not decide whether the improper purpose defense applies here because even if it did, Passco Trust has failed to prove that releasing the Requested Information to Grand Acquisition actually would harm the Trust.

Passco Trust's improper purpose defense is based on its belief that Grand Acquisition is affiliated with Maxus Realty Trust, LLC ("Maxus"). Grand Acquisition's affiliation with Maxus is demonstrated by "several publicly-available documents."[63] First, a news article on Maxus's website announces Maxus and Grand Acquisition's joint acquisition of an apartment community, the Reserve at Tranquility Lake, and states that Grand Acquisition's owners are related parties of

---

[60]    Def.'s Opening Br. 54 (citing *Bond Purchase*, 746 A.2d at 857 (applying the improper purpose defense in the LP context)); *see also Arbor Place*, 2002 WL 205681, at *4 n.9 (applying the improper purpose defense in the LLC context).

[61]    Def.'s Opening Br. 54.

[62]    Pl.'s Answering Br. 28.

[63]    Def.'s Opening Br. 12.

24

MRTI, a Maxus subsidiary.[64]  Second, one of Grand Acquisition's two members, GMG Real Estate, LLC,[65] is owned by Greg Orman, a member of the Maxus board.[66]  Third, Grand Acquisition's operating agreement states that David Johnson, Maxus's CEO, is a guarantor of certain Grand Acquisition debt and grants Johnson the power to serve as Grand Acquisition's "Special Manager" and "break any deadlocked vote" between the company's managers if Grand Acquisition defaults on any of that guaranteed debt.[67]  Grand Acquisition, for its part, denies that it is a "subsidiary or affiliate of any Maxus entity" and states that Maxus and its affiliates "do not have any ownership or membership interest in . . . and do not have direct or indirect control of" Grand Acquisition.[68]

According to Passco Trust, Grand Acquisition's relationship with Maxus is problematic because of Passco Parent's "long history of painful dealings with Maxus."[69]  Alan Clifton, Passco Parent's Senior Vice President of Investments &

---

[64]     Carpenter Aff. Ex. H, at PASSCO000010.

[65]     Carpenter Aff. Ex. J, at GA400-01.

[66]     Carpenter Aff. Ex. K, at PASSCO000002-04.

[67]     Carpenter Aff. Ex. J, at GA387-88.

[68]     Pl.'s Resps. to Def.'s Req. for Produc. & Interrogs., at 5.

[69]     Def.'s Opening Br. 14.

Operations, detailed three of those "painful dealings" in an affidavit.[70] In each of those instances, a Passco Parent affiliate managed a real estate asset in which a Maxus affiliate was invested.[71] In one instance, the Maxus affiliate sued the Passco Parent affiliate for not acknowledging its investment in the real estate asset.[72] In the other two instances, the Maxus affiliate exercised its right to dissent to a sale of the real estate asset.[73] Passco Trust also points to the following statements made by the District Court of Douglas County, Nebraska, in an action captioned *Institutional Bond Investors II L.L.C. v. America First Tax Exempt Investors, L.P.*, regarding an entity that Johnson controlled:

> [Johnson's entity] employs a business strategy wherein it purchases a small fraction of a company or partnership in order to gain a toehold in the enterprise . . . to gain access to sensitive business information which, if successful, is then used for exploitation of either the business, its less sophisticated shareholders, or both.[74]

"In sum," the Trust's improper purpose defense is based on its view that Grand Acquisition, as a Maxus affiliate, will use the Requested Information "to be

---

[70]    Carpenter Aff. Ex. D ("Clifton Aff.").

[71]    *Id.* ¶ 4.

[72]    *See id.* ¶ 4(a).

[73]    *See id.* ¶ 4(b)-(c).

[74]    Carpenter Aff. Ex. M, at PASSCO000042.

26

disruptive and cause stress upon passive investors in order to make financial gains at others [sic] expense."[75]

Although Passco Trust's evidence may suffice to establish that Passco Manager has a good faith belief that revealing the Requested Information to Grand Acquisition is not in Passco Trust's best interests, it does not suffice to prove that revealing the Requested Information to Grand Acquisition actually would harm the Trust.[76] In *Bond Purchase*, then-Vice Chancellor Steele discussed, in the context of an LP, the distinction between a statutory good faith defense and a contractual improper purpose defense:

> In order to establish the improper purpose defense for purpose of denying a partner its contractual right to a list of partners, a partnership must prove that disclosure of a list of partners . . . would in fact be adverse to the Partnership. That is, the partnership must prove that the adverse effect it believes disclosure of the list would have on the partnership is more likely than not to occur if the

---

[75] Clifton Aff. ¶ 6.

[76] *See Bond Purchase*, 746 A.2d at 859 ("While the Partnership proved by a preponderance of the evidence that the General Partner in good faith believes that disclosing the Investor List to Bond is not in the best interest of the Partnership, it failed to prove by a preponderance of the evidence that disclosing the Investor List to Bond would in fact be adverse to the interests of the Partnership."). It is worth noting Grand Acquisition's representation, both in its opening brief and at oral argument, that it "will agree that only [Grand Acquisition] will utilize the [Requested Information], and will not disclose such information to persons outside the company." Pl.'s Opening Br. 19; *accord* Oral Arg. Tr. 30-31. Such an agreement may help to assuage Passco Manager's concerns, to the extent they are well-founded.

27

partnership discloses the list to the partner. Under 17-305(b), on the other hand, the general partner of a partnership needs to prove by a preponderance of the evidence only that there is a basis for it in good faith to believe that providing a partner with a list of partners would not be in the best interest of the partnership or would damage the partnership. The partnership does not need to prove that it is more likely than not that actual damage would occur if the partnership were to disclose the list. The distinction in proof between Section 17-305(b)'s defense to a statutory claim and the "improper purpose defense" to a claim of contractual right is appropriate because in the case of a contractual right parties to the partnership may bargain for language in the partnership agreement designed to give partners access to information under terms less restrictive and in addition to that granted by statute.[77]

The evidence that Passco Trust has adduced is vague and speculative, and Passco Trust fails to satisfy its burden of demonstrating that releasing the Requested Information to Grand Acquisition actually would be adverse to the Trust.

Notably absent from each of the three instances that Clifton describes in his affidavit is any allegation of damage to the "value of the joint investment."[78] Instead, Clifton merely describes run-of-the-mill business conflicts between an investor in a real estate asset and that asset's manager.[79] As then-Vice Chancellor

---

[77]    *Id.* (footnotes omitted) (citing *Paine Webber I*, 1996 WL 535403, at *7).

[78]    *Madison Real Estate*, 2008 WL 1913237, at *13 (quoting *Paine Webber I*, 1996 WL 535403, at *7).

[79]    *See* Clifton Aff. ¶ 4.

Jacobs held in *In re Paine Webber Limited Partnerships*, a "claim that the limited partners could be harmed by the plaintiffs' aggressive sales tactics" does not suffice to establish an improper purpose defense.[80]  Instead, defendants must prove that the plaintiff's "conduct would adversely affect (in an economic sense) the defendant limited partnerships as a whole, as distinguished from the limited partners as individuals."[81]  Passco Trust has not proved, by a preponderance of the evidence, that Grand Acquisition's inspection of the Requested Information would adversely affect the Trust in an economic sense.  Thus, while Passco Trust likely could refuse Grand Acquisition's Statutory Demand under the good faith defense in Section 3819, Passco Trust may not refuse Grand Acquisition's Contractual Demand under the improper purpose defense.  Grand Acquisition, therefore, is entitled to inspect, examine, and copy the Requested Information.

## III.  CONCLUSION

For the foregoing reasons, I grant Grand Acquisition's motion for summary judgment and deny Passco Trust's motion for summary judgment.

**IT IS SO ORDERED**.

---

[80]  *Paine Webber I*, 1996 WL 535403, at *8.

[81]  *Id.*